# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 17, 2001 Session

## STATE OF TENNESSEE v. GALGALO B. HALAKE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-B-1232    Walter Kurtz, Judge**

———————————

**No. M2000-00146-CCA-R3-CD Filed November 29, 2001**

———————————

A Davidson County grand jury indicted the defendant, Galgalo B. Halake, for first-degree murder. The petit jury convicted him of that offense. The defendant filed a motion for new trial and a motion for judgment of acquittal. The trial court denied the defendant's motion for new trial, but granted the defendant's motion for judgment of acquittal by reducing the defendant's conviction to second-degree murder. Subsequently, the trial court sentenced the defendant to serve twenty-two years of incarceration. The state appeals the trial court's reduction of the conviction to second-degree murder. The defendant appeals his conviction, challenging the admission of certain testimony, the trial court's failure to charge the jury with the lesser-included offense of voluntary manslaughter, the sufficiency of the evidence, and the propriety of his sentence. We find that there is sufficient evidence to support a jury finding of guilt of first degree murder. However, because the trial court erred in allowing lay opinion testimony concerning blood spatters, we reverse the decision of the lower court and remand this case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Collins Hooper, (at trial & on appeal), Assistant Public Defender; R. David Baker, (at trial & on appeal), Assistant Public Defender; and Jeffrey A. DeVasher, (on appeal), Assistant Public Defender, Nashville, Tennessee, for appellant, Galgalo B. Halake.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Bret Gunn, District Attorney General, for appellee, State of Tennessee.

# OPINION

## Factual Background

The defendant, Galgalo B. Halake, lived in an apartment with the victim, Yohanes G. SoFoyie, and another man, Liban Conchero. All three men were natives of Ethiopia. On April 18, 1998, the victim was shot several times and killed outside his apartment door. A neighbor heard the shots, but the police did not investigate the murder until another neighbor discovered the victim's body. After the shots were fired, another neighbor, who had also heard the shots, saw a black man wearing dark clothes walk down a hill behind the apartment complex and drive away in a green or grey Nissan 240SX. The man was carrying something in his left hand.

When the police arrived at the crime scene, they discovered that the victim had been shot several times at close range, within two feet or less and had sustained a massive blow to the head. The victim's blood was spattered on the door, the door frame, and immediately inside the apartment, on the walls and ceiling. The victim was not robbed, and the killer did not enter the apartment by force. The victim was found holding keys in his hand.

The defendant arrived at the crime scene at sometime after 3:00 a.m. The police asked him to identify the body, and he made a positive identification. There is conflicting testimony about whether the police had taped off the entire area around the crime scene at that time. The defendant told the police that he had been at a local night club at the time of the murder. He stated that he made several phone calls to his girlfriend from that night club around midnight after receiving her pages.

Phone records from the night club pay phones indicate that several calls were placed from that night club to the defendant's girlfriend's residence, but the calls were placed between 1:00 and 1:30 in the morning and indicate that they were intercepted by voice-mail. Additionally, the defendant had telephoned his girlfriend around 12:15 in the morning after receiving several pages from her. However, the defendant's girlfriend testified that although the defendant told her that he was calling her from the nightclub, she did not hear any background noise. The defendant's girlfriend's phone records indicate that a call was made to her residence around 12:15 a.m. However, the records for this phone call are incomplete and indicate that the call could have been made from Atlanta, Georgia or by using a long-distance phone card.

The police searched the defendant's car, a Nissan 240SX, and found no traces of blood or gunpowder. They inspected the clothes that the defendant was wearing when he arrived at the crime scene and found two drops of the victim's blood on his pants. The drops were not visible to the naked eye and were only visible through the use of special light, and no blood was found elsewhere on the defendant's person. The police also learned through several witnesses that the defendant, having heard rumors of an affair, had been suspicious of the victim's relationship with his girlfriend. He questioned his girlfriend about the relationship several times, the last instance being at least a month prior to the murder. In these confrontations, the defendant did not threaten to kill or hurt the victim. The defendant also confided in a friend that he was suspicious of the victim's relationship with his girlfriend, but his friend testified that the last time the defendant spoke to him of these suspicions was at least a month before the victim's death.

The defendant's other roommate, Mr. Conchero, arrived at the crime scene with a female prostitute, who provided an alibi for Mr. Conchero. The police later learned that this alibi was false, and several months after the murder, Mr. Conchero left town and could not be located. Additionally, a neighbor testified that the day before the murder, several suspicious-looking men knocked on her door. She did not answer her door, but saw them place a note on the victim's car.

The defendant was arrested and tried by jury for first-degree murder. At trial, a police detective, Officer Hunsicker, testified regarding the blood spatter that he discovered at the crime scene. The trial court allowed the detective to testify that, in his opinion, the blood spots located on the defendant's pants were consistent with other gunshot blood spatter that he had observed at other crime scenes, despite defense counsel's objection:

By General Gunn [prosecuting attorney]:

Q: Officer Hunsicker, how did those spots on the pant leg compare to the blood spatter that you'd seen out at the crime scene?

A: They were consistent with what you had on the walls out there.

Q: And did the spatter on the walls appear to be spattered from a particular type of impact?

A: I couldn't —

Ms. Hooper [defense attorney]: Your Honor, I object. I don't think he's been qualified as an expert on blood spatter. I don't think he can testify to that.

General Gunn: I am not asking as an expert. I'm asking on the basis he's been to a hundred crime scenes and seen gun shot wounds and knows what blood looks like after it's been spattered off a body from a gun shot wound.

The Court: Seems to me that's — that is the point defense counsel is making. So I'm going to sustain the objection unless you lay the foundation here.

By General Gunn:

Q: Officer Hunsicker, in these hundreds of crime scenes that you've been to, have you observed bodies or victims that have been shot by gun shots?

A: Yes, I have.

Q: And have you also observed people who have been struck with objects?

A: Yes, I have.

Q: And have you also observed blood that has been dripped from a person?

A: Yes, I have.

Q: And in your experience have you seen differences in the way this blood appears when it strikes other objects?

A: I have. Yes.

Q: Now what is the difference in those type of things?

A: The blood spatter that's in question here was consistent with what was on the wall —

The Court: Excuse me. You've asked a general question to foundation. So you understand the distinction I'm making? And he's trying to answer about this case. We're still on foundation.

By General Gunn:

Q:   Right.  I'm asking not about this case, but about in general what are the differences that you observed between blood that comes from a gun shot victim, blood that comes from somebody who blunt force [sic], and blood that's just dripped when it hits another surface.
A:   The blood that you're going to see that comes from a gun shot is going to be small and circular.  Whereas the only way you can get that pattern is from the velocity of gun shot or aspirated blood out of someone's lungs.  The other spots, you're not going to have as fine a pattern as you do because the way that the force presented such as with a bat or two-by-four.  It's not going to have enough force to mist the blood.
Q:   Have you attended classes in blood spatter analysis?
A:   I have attended crime scene schools where they covered blood spatter, but I have not attended a full course in blood spatter.
General Gunn: Judge, I think — I'm not going to ask for an expert opinion.  I'm going to ask questions about consistency with what he's seen in the past.

After this exchange, the trial court held a jury-out bench conference, in which defense counsel objected to the officer's testimony, arguing that the state had improperly failed to give defense counsel notice of their intention to use expert testimony on this subject, despite defense counsel's inquiry whether the state had such an intention a week prior to trial.  The court ruled that the officer's testimony was expert testimony under Tennessee Rule of Evidence 702, contrary to the prosecution's contention otherwise, because the officer was testifying about his expertise, which was "out of the realm of most lay people."  However, the court also ruled that the notice issue lacked merit because a week's notice would not have allowed defense counsel sufficient time to obtain and prepare a rebuttal expert witness.  The court overruled defense counsel's motion and allowed the prosecutor to ask the officer how the blood drops on the defendant's pants compared to the blood spatters that he had seen in other crimes involving gun shot wounds, and the officer replied that the two were consistent.

At the conclusion of the proof, the court charged the jury with instructions regarding both first and second-degree murder, but did not include an instruction for voluntary manslaughter.  The jury found the defendant guilty of first-degree murder, but the trial court granted the defendant's motion for judgment of acquittal, reducing the conviction to second-degree murder upon finding that there was insufficient proof of premeditation.

The state appeals the trial court's reduction of the defendant's sentence from first-degree murder to second-degree murder pursuant to its grant of the defendant's motion for acquittal.  The defendant also appeals his conviction, alleging (1) that the trial court erroneously admitted Officer Hunsicker's testimony; (2) that the prosecution's failure to give defense counsel notice of its intent to use expert testimony violated his due process rights and right to effective counsel; (3) that the evidence is insufficient to support the defendant's conviction for second-degree murder; (4) that the trial court erred by failing to charge voluntary manslaughter; and (5) that the trial court imposed an excessive sentence because it did not accord the proper weight to the applicable mitigating factors.

For the following reasons, we find that the trial court erred by reducing the defendant's conviction form first-degree to second-degree murder.  Furthermore, we find that the trial court erred

by admitting Officer Hunsicker's testimony and that the prosecution erroneously failed to give defense counsel notice of its intent to use such testimony. Accordingly, we reverse the conviction below and remand this case for a new trial on charges of murder in the first-degree.

### Sufficiency of the Evidence to Support
### A Verdict of First-Degree or Second-Degree Murder

The state appeals the trial court's reduction of the defendant's conviction from first-degree murder to second-degree murder. The state argues that the evidence, viewed in the light most favorable to the state, supports the defendant's conviction for first-degree murder because it supports a finding of premeditation. The defense counters by arguing that the evidence is not sufficient even to support the reduced verdict for second-degree murder.

A trial court determines whether to grant a motion for judgment of acquittal by the same standard that this Court applies on appeal when determining the sufficiency of the evidence to support a conviction, namely whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Gillon, 15 S.W.3d 492, 496 (Tenn. Crim. App. 1997) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)); see also State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). To determine whether the evidence is sufficient to support the conviction, the trial court must consider "the evidence introduced by both parties, disregard any evidence introduced by the accused that conflicts with the evidence adduced by the State, and afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence." State v. Campbell, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). "An appellate court must apply the same standard as a trial court when resolving issues predicated upon the grant or denial of a motion for judgment of acquittal." Gillon, 15 S.W.3d at 496 (citation omitted).

A homicide, once proven, is presumed to be second-degree murder. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). Therefore, the State has the burden of proving the element of premeditation to elevate the offense to first-degree murder. Id. Premeditation necessitates "the exercise of reflection and judgment," requiring a "previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). The element of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the appellant's conduct in light of the surrounding circumstances. See generally State v. Johnny Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996).

Although there is no strict standard governing what constitutes proof of premeditation, several relevant circumstances are helpful, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; a declaration by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additional factors from which a jury may infer

premeditation include planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing. Gentry, 881 S.W.2d at 4-5.

When granting the defendant's motion for judgment of acquittal, the trial court found that while there was some evidence that the defendant was lying in wait for the victim because he hid his car behind the apartment complex, this evidence was not, in the trial judge's opinion, sufficient to prove the defendant's premeditation beyond a reasonable doubt. As the trial court recognized, there is evidence that the defendant was lying in wait for the victim because immediately after the shooting, a person of his height and race was seen en route to a car that was parked behind the victim's apartment complex and that matched a description of the defendant's car. Considering the evidence in the light most favorable to the state, one could infer that this individual was the defendant, who was returning to his car after having hid it before committing the murder of the victim.

Evidence that a defendant lay in wait for a victim is strong evidence of premeditation. See State v. Bullington, 532 S.W.2d 556 (Tenn. 1976). Additionally, in the instant case the victim was shot multiple times, which although not indicative of premeditation when considered by itself, can be considered as evidence of premeditation in addition to other proof of premeditation. See State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992). Therefore, there were two bases upon which a jury could have found premeditation beyond a reasonable doubt.

Furthermore, the unreported case that the trial court cites in support of its finding that there was not sufficient evidence of premeditation, State v. Clarence Davis, No. 01C01-9811-CR-00451, 1999 WL 737873, at *1 (Tenn. Crim. App. at Nashville Sept. 22, 1999), is distinguishable from the instant case. Specifically, in Clarence Davis, this Court reduced Davis's first-degree murder conviction to second-degree murder based upon the insufficient evidence of premeditation because, inter alia, there was no evidence of any "planning activity." Id. at *4. Conversely, in the instant case, the state did introduce evidence of planning activity, namely that the defendant hid his car and lay in wait for the defendant inside their apartment.

Because the evidence presented at trial was sufficient to support a conviction for first-degree murder, we hold that the trial court erred in reducing the defendant's sentence to second-degree murder.

### Admission of Blood Spatter Testimony
### A. Waiver

The defendant challenges the trial court's admission of Officer Hunsicker's testimony regarding the blood spots found on the defendant's pants. The police discovered two small round spots of the victim's blood on the defendant's pants legs, one above and one below his right knee. Officer Hunsicker, who had observed one hundred crime scenes and various forms of blood spatter, was not trained as an expert in identifying blood spatter. However, the trial court allowed Officer Hunsicker to testify that the spots of the victim's blood found on the defendant's pants were consistent with other gunshot blood spatter based on Officer Hunsicker's experience. The defendant argues that the admission of this testimony was erroneous and prejudicial because Officer Hunsicker was not qualified to testify as an expert witness and because the testimony provided a basis for inferring guilt in an case comprised largely of circumstantial evidence. The state argues that the

defendant has waived this issue for appeal because defense counsel failed to make a timely objection to the relevant testimony.

In order to challenge the introduction of evidence at trial on appeal, counsel must make a contemporaneous objection to the admission of the evidence. Grandstaff v. Hawkes, 36 S.W.3d 482 (Tenn. Ct. App. 2000). An objection is contemporaneous if counsel makes the objection in a motion in limine or at the time the objectionable evidence is about to be introduced. Id. Defense counsel objected to the admission of Officer Hunsicker's testimony when the prosecuting attorney asked Officer Hunsicker to testify regarding his analysis of the blood spots on the defendant's pants. At the time of the objection, the prosecuting attorney asked Officer Hunsicker what caused the blood spatter that he had observed at the crime scene. Prior to being asked this question, Officer Hunsicker had testified primarily about his observations at the crime scene, but had not offered any blood spatter analysis. Defense counsel made an objection during Officer Hunsicker's first attempt to analyze the blood spots on the defendant's pants and to speculate as to their origin.[1] Because defense counsel objected as soon as it became apparent that the state was asking the officer to analyze the blood spatters in the instant case and offer an opinion with regard to them, a task requiring expertise, we find that defense counsel made a timely objection and has therefore not waived this issue for appeal.

## B. Expert Qualifications

After defense counsel's objection, the state attempted to lay a foundation to establish Officer Hunsicker's qualifications to answer the question at issue. After the state engaged in this exercise, the trial court held a jury-out hearing and ruled that Officer Hunsicker was qualified to answer the limited question of whether the blood spots on the defendant's pants were consistent with the blood spatter that the officer had observed as a result of other gunshot wounds. The court determined that Officer Hunsicker could qualify as an expert witness under Rule 702 based upon the officer's experience observing blood spatter at numerous crime scenes.[2]

---

[1] While Officer Hunsicker testified about his knowledge of different types of blood spatter earlier in his testimony, he neither attempted nor was asked to make any correlations between the blood spatter found on the defendant's pants and blood spatter created by other gunshot wounds. Moreover, he did not testify as to his opinion of how the blood spatter in the instant case was created. He merely testified regarding how different types of spatter *may* be created and his observations as an investigator inspecting the crime scene.

Moreover, as discussed infra, defense counsel was not aware that Officer Hunsicker would engage in this type of analysis, as the state assured defense counsel that it would not offer any expert testimony on blood spatter analysis. Therefore, defense counsel was surprised by the introduction of this expert testimony and objected as soon as they recognized that the state was attempting to introduce it.

[2] The trial court allowed the testimony despite the fact that although defense counsel requested notice of prosecution's intent to introduce such testimony, the prosecution failed to give defense counsel any notice. The court concluded that even if the prosecution had given defense counsel notice when defense counsel requested it a week prior to trial, a week's notice would not have allowed defense counsel to make any additional preparations to combat such testimony.

"Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court, whose ruling will not be overturned in the absence of abuse or arbitrary exercise of discretion." State v. Begley, 956 S.W.2d 471, 475 (Tenn. 1997).  The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.  Evidence is "scientific technical or other specialized knowledge" if "it concerns a matter that 'the average juror would not know, as a matter of course . . . .'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)).

The trial court properly categorized Officer Hunsicker's testimony as expert testimony because his opinion testimony was predicated upon specialized knowledge that is unfamiliar to most lay-persons and that is normally offered as expert testimony, due to its complex nature.  See, e.g., State v. Melson, 638 S.W.2d 342 (Tenn. 1982) (recognizing "blood stain analysis" and the analysis of blood spatters as a field of expertise); State v. Paul Dennis Reid, No. M1999-00803-CCA-R3-DD, 2001 WL 584283, at *18 (Tenn. Crim. App. at Nashville May 31, 2001) (referring to the testimony of an expert in blood spatter analysis); State v. John Charles Johnson, No. M2000-00529-CCA-R3-CD, 2001 WL 208512, at *3-*4 (Tenn. Crim. App. at Nashville Mar. 1, 2001) (referring to the expert testimony of a forensic pathologist in blood spatter analysis); State v. Damon Theodore Marsh, No. M1999-01879-CCA-R3-CD, 2000 WL 1449849, at *2 (Tenn. Crim. App. at Nashville Sept. 29, 2000) (referring to the testimony of an expert on blood spatter analysis); State v. Joyce M. Lindsey, No. 02C01-9804-CR-00110, 1999 WL 1095679, at *6 (Tenn. Crim. App. at Jackson Oct. 28, 1999) (referring to the testimony of an expert in blood spatter analysis); State v. Allan Brooks, No. 01C01-9510-CC-00324, 1998 WL 754315, at *3 (Tenn. Crim. App. at Nashville Oct. 29, 1998) (referring to the testimony of an expert in blood spatter analysis); State v. King David Johnson, Jr., No. 01C01-9610-CC-00430, 1997 WL 661501, at *2 (Tenn. Crim. App. at Nashville Oct. 24, 1997) (referring to the testimony of an expert in blood spatter analysis); State v. Joey L. Kilzer, C.C.A. No. 1, Dyer County Criminal, 1988 WL 132721, at *1 (Tenn. Crim. App. at Jackson, Dec. 14, 1988) (referring to the expert testimony of a forensic pathologist in blood spatter analysis).

Thus, the remaining issue is whether the trial court abused its discretion when it qualified Officer Hunsicker as an expert witness for the purpose of answering the prosecution's question about the similarity between the blood spots on the defendant's pants and other blood spatter that the officer had observed from other gunshot wounds.  In 1982, the Tennessee Supreme Court addressed the admissibility of blood spatter analysis in State v. Melson, 638 S.W.2d 342 (Tenn. 1982). The Melson court held that blood spatter analysis was a proper subject for expert testimony in Tennessee. The expert in Melson, who testified regarding his analysis of the blood spatter found on the defendant's clothes, was extremely well-qualified to analyze the blood spatter based on his extensive training and expertise.  Id. at 350.  Although the defendant Melson did not challenge the expert's qualifications, the supreme court noted that "the expert gave an extremely clear explanation, accompanied by a demonstration, of the difference between a typical drop of blood and the spray on

the defendant's clothes." Id.; see also Danny J. Veilleux, Annotation, *Admissibility, in Criminal Prosecution, of Expert Opinion Evidence as to "Blood Splatter" Interpretation*, 9 A.L.R.5th 419 (1993) (quoting Melson, 638 S.W.2d at 350).   In the instant case, Officer Hunsicker had some training, although not extensive, in blood spatter analysis, as he "attended crime scene schools where they covered blood spatter, but [did] not attend[] a full course in blood spatter." Moreover, unlike the blood analysis expert in Melson, Officer Hunsicker did not specifically explain to the jury the difference between a typical blood drop and the blood on the defendant's pants, which he identified as consistent with gun shot spatter.

Nevertheless, the trial court determined that while Officer Hunsicker was not qualified to testify as an expert based on his training, he could qualify as an expert based upon his observations of numerous blood spatters at other crime scenes. The trial court also noted that his qualification as an expert was for the limited purpose of answering the prosecution's one question.

Blood spatter analysis is a complicated subject, as the analyst studies the blood spatter and determines what blow created the spatter, thereby recreating the events of the crime. See, e.g., Melson, 638 S.W.2d 342. Other states have also recognized the complexity of blood spatter analysis and the necessity of having a well-qualified expert testify regarding his or her analysis of the blood spatters. See State v. Goode, 461 S.E.2d 631 (N.C. 1995) (rejecting the defendant's argument that an expert was not sufficiently qualified as a blood spatter analyst, as the expert attended two training seminars on blood-spatter analysis, one basic and one advanced, as well as other courses that dealt with this type of analysis, and who now instructed other SBI agents on blood spatter analysis); see also Veilleux, supra, at 435-41 (annotating cases in which police officers with sufficient training and expertise were allowed to testify as blood spatter analysis experts and cases in which police officers were deemed not to have sufficient qualifications to testify as experts).

In the instant case, Officer Hunsicker, as the testifying expert, was asked to engage in complex blood spatter analysis. The prosecution's question, which asked Officer Hunsicker to determine whether the blood spots on the defendant's pants were consistent with gunshot blood spatter, required Officer Hunsicker to engage in blood spatter analysis. However, there is considerable question about Officer Hunsicker's qualifications to engage in such analysis. Specifically, neither the prosecuting attorney nor Officer Hunsicker himself viewed Officer Hunsicker as someone qualified to engage in such analysis. After questioning Officer Hunsicker about his qualifications to analyze blood spatter, the prosecuting attorney stated that he did not wish to qualify Officer Hunsicker as an expert, but rather wanted him to testify as a lay person. Furthermore, Officer Hunsicker testified after he had been qualified as an expert by the trial court that he was "not an expert."

Under the circumstances, there does not appear to have been a sufficient basis for qualifying Officer Hunsicker as an expert in blood analysis, and we therefore hold that the trial court erred by so qualifying Officer Hunsicker. We furthermore hold that the defendant was prejudiced by Officer Hunsicker's testimony concerning the blood spatters. Officer Hunsicker testified that the blood spots on the defendant's pants were consistent with other gunshot blood spatter that he observed at other crime scenes, thereby providing a basis for the prosecution to contradict the defendant's suppositions that the blood spots had been deposited as a result of the defendant kneeling at the crime scene, the fact that the defendant and the victim shaved together and cut vegetables together, or the fact that the victim may have mistaken the defendant's pants as his own. In its closing arguments, the state

referred to Officer Hunsicker's testimony, reminding the jury that the spots on the defendant's pants were "gunshot blood spatter," consistent with the blood spatter found on the door frame. For the forgoing reasons, we find that this error requires a new trial.


### C. Lack of Notice of Intent to Use Expert Testimony

Because we have concluded that Officer Hunsicker should not have been qualified as an expert regardless of whether the state gave notice of his testimony, this issue is moot.


### D. Instruction of Lesser-Included Offense

The defendant contends that the trial court erroneously failed to instruct the jury on the lesser included offense of voluntary manslaughter when it instructed the jury on first-degree and second-degree murder. The defendant argues that because the trial court reduced the defendant's conviction from first-degree to second-degree murder after finding that there was not adequate evidence upon which a jury could have found premeditation, the trial court should have instructed the jury on voluntary manslaughter, as it is a lesser-included offense of second-degree murder. However, as noted above, we find that the trial court erred when it found that there was insufficient evidence to support a finding of first-degree murder, and therefore any failure to give an instruction on voluntary manslaughter was at most harmless error.

. In State v. Williams, 977 S.W.2d 101 (Tenn. 1998), the Tennessee Supreme Court held that a trial court's failure to instruct the jury on voluntary manslaughter was harmless error where the trial court instructed the jury on first-degree and second-degree murder, and the jury convicted the defendant of first-degree murder.

It is an elementary principle of law that jurors are presumed to follow the instructions of the trial court. State v. Cribbs, 967 S.W.2d 773, 784 (Tenn.1998); State v. Laney, 654 S.W.2d 383, 389 (Tenn.1983). By convicting the defendant of first degree murder the jury determined that the proof was sufficient to establish all the elements of that offense beyond a reasonable doubt, including that the killing was "intentional, deliberate and premeditated." In other words, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter. Accordingly, the trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilt on the greater offense of first degree murder and its disinclination to consider the lesser included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.

<u>Williams</u>, 977 S.W.2d at 106. We find the instant case to be analogous to <u>Williams</u>, as the trial court instructed the jury on both first-degree and second-degree murder, and the jury convicted the defendant of first-degree murder. Accordingly, any error in not instructing the jury on voluntary manslaughter constitutes harmless error.

### Sentencing Challenge

The defendant challenges the length of his sentence as excessive, alleging that the trial court failed to give his mitigating factors sufficient weight when sentencing him. We first note that because we remand this case for a new trial, the defendant's sentencing challenge is moot.

Nevertheless, it appears from the record that while the trial court considered the mitigating factors offered by the defendant, he failed to give them much weight, finding instead that the enhancing factor, the defendant's use of a firearm, to be more weighty. The sentencing statute does not prescribe the weight that must be afforded each applicable enhancing or mitigating factor, as the weight given to each factor is left to the discretion of the trial court, provided that its findings are supported by the record. <u>State v. Santiago</u>, 914 S.W.2d 116, 125 (Tenn. Crim. App.1995); <u>see also</u> Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. We find that the trial court's findings are supported by the record, and therefore the trial court did not err in its consideration of applicable mitigating factors.

### Conclusion

For the forgoing reasons, we find that the state's issue and one of the defendant's issues are meritorious, and three of the defendant's issues lack merit. Accordingly, the judgment of the lower court is REVERSED AND REMANDED for further proceedings consistent with this opinion.

_____
JERRY L. SMITH, JUDGE