IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2012

**STATE OF TENNESSEE v. JEFFREY LEO ROCHELLE**

**Appeal from the Circuit Court for Lawrence County**
**No. 29160      Stella Hargrove, Judge**

**No. M2011–02639-CCA-R3-CD - Filed January 25, 2013**

The defendant, Jeffrey Leo Rochelle, was indicted for first degree premeditated murder and was convicted by a jury of the lesser included offense of voluntary manslaughter, a Class C felony.  On appeal, the defendant alleges the evidence was insufficient to support his conviction and that the trial court should have granted a mistrial when a witness testified regarding the defendant's anger management issues.  After a careful review of the record, we conclude there was no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and JAMES CURWOOD WITT, Jr., JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Jeffrey Leo Rochelle.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Mike Bottoms, District Attorney General; and Christie Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In 2006, David "Marble" Folger was assaulted on the front porch of the defendant's mother's home and died soon after of the injuries he received.  No arrest was made in the years immediately following the death, but in 2010, the Tennessee Bureau of Investigation ("T.B.I.") took over the matter as a cold case, and as a result of an interview leading to a confession, the defendant was charged with first degree premeditated murder.  The case was tried by a jury.

At trial, Agent Josh Melton of the T.B.I. testified that he interviewed the defendant

for the first time on July 19, 2010, after advising him of his rights. The defendant gave a statement implicating Jonathan[1] and Blake Clayton, two of his friends. According to the statement, which the defendant later disavowed, the defendant had been fishing with the Clayton brothers about three days before the assault. The victim had been staying at the defendant's mother's house to protect her property while she was out of town. According to the statement, the victim was there to prevent the Claytons from stealing anything, and the defendant told the Claytons that he wanted the victim to leave. The Claytons then told the defendant that they would beat the victim in order to scare him away. The defendant expressed frustration with the victim, because the victim kept asking the defendant to drive him to get beer and cigarettes, would never help with the dishes or housework, and "was just constantly aggravating [the defendant] the whole time he was staying at [the defendant's] house with small things." The defendant wanted the victim to leave and stated he wanted to "resume [his] normal life."

On the day before the assault, the defendant and Jonathan Clayton made plans to go fishing. The defendant picked up Jonathan Clayton on the day of the assault, dropping off some hay as prearranged. The defendant's mother's house was very nearby, and the defendant saw the victim on the porch as they drove by. The defendant was surprised by the violence of the beating, and he told Jonathan Clayton to help move the victim to the couch. He then called his mother and 911, and Jonathan Clayton rode with the victim in the ambulance. The defendant took his vehicle, which was not street legal, to his grandfather's house after the police had left, and they went to the hospital, where they retrieved Jonathan Clayton. The defendant's statement asserted that Jonathan Clayton had apologized for having beaten the victim so badly and had told the defendant not to reveal the agreement they had made. The defendant stated he tried to distance himself from the Claytons after the assault. The victim did not know either of the Claytons well. The defendant's statement was begun at 6:25 p.m., and Agent Melton took notes during the statement, which he then typed up at a nearby office. The defendant signed the statement at 9:45 p.m.

Agent Melton investigated the alleged involvement of Jonathan and Blake Clayton the following day. Because he discovered that Blake Clayton was incarcerated in a juvenile detention facility at the time of the alleged planning and at the time of the assault, he concluded the defendant's story could not have been entirely truthful, and he interviewed the defendant again on July 20, 2010. On July 20, 2010, the defendant again waived his rights. When confronted with the inconsistencies discovered by Agent Melton, the defendant responded that he had "played" Agent Melton and that although the "first part" of what he told Agent Melton was true, he "didn't have anything to do with" the assault. The defendant stated that he had given the statement because the interview had been lengthy. Agent Melton

---

[1]Mr. Clayton's name is alternately spelled "Johnathan" in the transcript.

then testified that the defendant offered to give a truthful statement if Agent Melton could get the District Attorney General to give him a "deal." He also stated that the defendant asked if there was any way he could "walk away from this thing without doing any jail time." Agent Melton testified that the defendant wanted to put "this thing" behind him, as he had been "dealing with [it] for four years." According to Agent Melton, the defendant then stated, "I'm responsible for his death and all over the fact that I wouldn't go get him any beer." The defendant stated, "I was only 18 years old. I didn't know any better." When asked to elaborate, the defendant requested counsel. As the agents were leaving, the defendant reiterated his desire to get the situation "behind" him that night and expressed concern that he would "go [to] the electric chair." Agent Melton testified that he did not reduce his notes from the interview into a typewritten statement because the defendant had requested counsel and he would not have been able to ask him to sign it outside his counsel's presence.

On cross-examination, Agent Melton testified that an individual named Billy Self (who was accused by the defendant of bragging about beating someone to death near the time of the assault) had been interviewed by Detective Ferguson and by a T.B.I. agent, but that another potential witness, Kirk Pyle, had not. He testified that he did not record the interviews with the defendant because it was not his policy to do so. He testified that on July 19, 2010, the portion of the interview during which he was talking with the defendant lasted approximately one and a half hours. Agent Melton testified that for approximately thirty minutes, the defendant provided a timeline of his activities that day and spoke of "personal matters," before he started to tell "what really happened." Agent Melton did not include this timeline in the written statement because the defendant subsequently stated that the statements in the timeline were not truthful. Agent Melton acknowledged that his notes did not record the defendant's disavowal of the timeline portion of his statement.

During cross-examination, the defendant's attorney questioned Agent Melton regarding the various parts of the defendant's initial statement:

> Q. Okay. Well, that's – that's what I want to get to. Well, he told you, "I played you last night. None of that was true, except the first part," correct?
> A. Correct.
> Q. And the first part he was referring to was the first 30 minutes, where he told you where he was all day long?
> A. And personal matters.
> Q. Okay. About being friends with the victim?
> A. No, about the fact that he snapped with anger issues, and that he would go into fits of rage, and he couldn't control his anger.

The defendant's attorney did not object at the time. Focusing on the timeline, he requested Agent Melton to read his notes commemorating the defendant's alibis into the record, and then had the section detailing the timeline marked for identification. The defendant's statement indicated that he had been logging with his uncle, ate at his grandmother's house, and worked at Brad Rochelle's house prior to discovering the victim with Jonathan Clayton. Agent Melton had difficulty distinguishing his own handwriting recording the defendant's statement regarding where he was when he saw the victim, but he agreed it was possible he had written, "I was in line with the mailbox when I saw him." The defendant indicated that the victim was mumbling, and he could only understand the words "Pat White." The notes reflect that the defendant stated no storm door was up at the time. Agent Melton was then further cross-examined about his notes:

> Q. And then you begin a second phase of the interview[,] don't you?
> A. Yes.
> Q. And it's entitled, "Buttons," isn't it?
> A. Yes.
> Q. And so clearly, is there any question in your mind, at this point, from where you left half a page blank that we're entering a second phase of this interview?
> A. I was, actually, into the third phase. This is how that happened, if you'll allow me to explain that to you. Is, he started talking about the issues that we just discussed.
>    He discussed the things that you had me read. He discussed – started talking about the things that I just told you about, about anger management issues.

Agent Melton testified that the defendant was told that he would be given the chance to talk at length about "what built up to the event" and that after the defendant had given his version of the events, Agent Melton gave him "an opportunity to talk about what you have indicated is buttons." Agent Melton said that the defendant was "very interested in the fact that I made a lot of notes in going through a lot of details about the issues he was dealing with."

Defense counsel further questioned Agent Melton regarding the grouping of his notes: "And the next two pages consist of a series of notes, but what you put at – as a header you put, 'Buttons'; is that right?" Defense counsel tried to clarify the order of the various portions of the oral statement:

Q. Now, let me ask you this, Agent Melton; are – are you saying now that – that this story that he told you happened before the discussion of the buttons?

A. No, he talked for a short period of time about anger management issues and the things that – that made him angry and made him act the way he acted.

We shut him down pretty quickly on that, because he wanted to get to the part of the story about what actually happened and why.

And I said, "Let's talk about what happened. Let's actually talk about what happened that night.

And when we're done with talking about exactly what happened, I will give you ample amount of time to go over everything that you want to talk about that you're dealing with, as far as – as far as these anger management issues and what's brought you to this point," because that – that was his words.

Defense counsel then moved to mark the notes, including the section on "Buttons" as an exhibit for identification purposes only, noting that he had an objection to the page about the buttons that he wanted to discuss outside the jury's presence. This reference to an objection was made ten pages after Agent Melton first mentioned anger management issues.

Defense counsel proceeded to question Agent Melton about the defendant's repudiation of his July 19, 2010 statement. Defense counsel asked Agent Melton what the defendant was referring to when he stated on July 20th that the "first part" of his statement had been true, and Agent Melton stated that he had started "talking about his temper. Those are the – that's the first portion of that – that statement." Defense counsel asked again if the defendant had meant the timeline, and Agent Melton again referenced "his temper and anger management."

On further cross-examination, Agent Melton acknowledged that his notes from the July 20, 2010 interview reflect that the defendant, after stating that he was responsible for the victim's death because he would not go get him beer, "began to talk about the fact that he had no involvement in [the victim's] death." He further acknowledged that his report only mentioned the defendant's denial of his involvement with the crime at the beginning of the report; Agent Melton explained that the defendant had also denied involvement at the very beginning of the interview.

Defense counsel pursued his objection to Agent Melton's testimony outside the presence of the jury, after the prosecutor requested a jury-out hearing in order to request the

court to allow redirect examination on the anger management issues. The court ruled that defense counsel's question had referred to the notes that delineated the timeline, and that the question had not opened the door to Agent Melton's testimony regarding anger management. The court found that defense counsel "never expanded, never really kept going on that anger or temper and control." Defense counsel requested curative instructions, and the court instructed the jury to disregard the references to the defendant's temper.

The State next introduced the testimony of Deputy Tonya Lance, who was the first officer to respond to the 911 call regarding the victim. She testified that she arrived on the scene at 7:55 p.m. and spoke to both the defendant and to Jonathan Clayton. Ms. Lance observed the victim lying unresponsively on the couch. She stated that the victim had visible marks on his body and that the porch contained an overturned and bloody wooden bench and a broken aquarium. She testified that the defendant responded to her questions but other than that was quiet and kept to himself, whereas Jonathan Clayton repeatedly asked what he could do to help and appeared concerned about the victim. On cross-examination, Deputy Lance testified that the defendant and Jonathan Clayton had been separated when she spoke with them and that they had stated that they found the victim and placed him on the couch. She saw no blood or injuries on the defendant when she spoke with him.

Dr. Leroy Barden, III, testified that the victim arrived at the hospital at 9:36 p.m., disoriented and "hard to control," with no coherent speech. He testified that the victim suffered bruising on his extremities and had five different brain injuries, including a hemorrhage. He testified that the injuries were not consistent with a fall but indicated more than one mode of injury. Dr. Barden testified he had never seen a CT scan with as many different areas of injury to the brain. The victim was stabilized and transported to a Nashville hospital for neurosurgery. Dr. Barden testified that the victim had money that had to be secured by a nurse. On cross-examination, he testified that he had essentially assessed the victim for triage purposes and would not have noted injuries which were not life-threatening, such as injuries to the genitals.

Dr. Everette Howell, Jr., testified as an expert in the field of neurosurgery. Dr. Howell testified that the victim arrived in a coma with no meaningful response to stimuli other than pain. He testified to numerous brain injuries which the victim sustained, and severe trauma to both sides of the brain. Dr. Howell removed a plate of bone over the left side of the victim's brain to accommodate swelling and removed dead brain tissue. He testified that the victim remained in a coma and had very little chance of survival, and he died after the withdrawal of life support. Dr. Howell testified that his death was caused by multiple injuries to the brain.

Patrick White, a close friend of the victim, testified that he had known the victim since

he was eighteen and had worked with him for twenty years. He testified that the victim had a drinking problem and had therefore quit driving, relying on Mr. White for transportation to work for a period of ten years. Mr. White testified that he had gotten the victim a job and was helping him stay sober by assigning him long hours of work, but that the victim quit coming to work one or two weeks prior to his death. Mr. White testified he frequently took the victim to run errands and that he had taken the victim to a bank on August 12, 2006 and the victim withdrew $500, some of which he used to purchase groceries and beer. Mr. White testified he was present when the defendant's mother and step-father asked the victim to housesit for them. Mr. White attempted to stop by to see the victim on the three days preceding the assault and on the morning of the assault but got no answer at the door. He was told by the victim's brother that the victim had a stomach virus. Mr. White stopped by the house the day after the assault, and noticed that there was blood on the porch and that a cylinder, which controlled the closing of the screen door broken and hanging off the roof.

Jonathan Clayton testified that the defendant came by his house, which was about one mile from the defendant's mother's house, at around four or five in the afternoon of August 17, 2006, and asked him to go fishing. He stated he had not seen the defendant for a "long time," and decided to go. As they were approaching the defendant's mother's house, the defendant stated he could see the victim, whom he referred to as "Marble," on the porch. Mr. Clayton testified equivocally that when the defendant made that statement, he could not yet see the house. Initially, when asked if he could see the house, he stated, "Not really, no." He elaborated that he could not see it "that very second." He then testified, "We got on up there and then I seen the guy laying on the porch. That's when he said, 'He's on the p[or]ch.'" According to Mr. Clayton, the defendant was acting as though there were nothing wrong. Mr. Clayton picked up the victim, who was trying to get out of the glass, and asked the defendant to open the storm door, which the defendant did. Mr. Clayton laid the victim on the couch while the defendant called his mother. The defendant then called 911. The victim asked for beer, and Mr. Clayton got the defendant to get him water; then the victim wanted a cigarette, but burnt his mouth on it. At that point, the victim began to shake and speak incoherently. Mr. Clayton testified that he did not know the victim but asked if he could ride to the hospital with him "until we figured out who he was." At that point, the defendant told him that he still wanted to go fishing.

On cross-examination, Mr. Clayton acknowledged having given several previous statements to police. He acknowledged that in a previous statement, he had stated that the defendant slammed the brakes on when they were by the mailbox; he affirmed that he had not mentioned not being able to see the house when the defendant saw the victim. He also acknowledged having written "we" helped him in the house and having written that the defendant kept asking the victim what was wrong, but he explained it may have been the defendant's mother who was on the phone trying to discover what was happening. On

redirect examination, the prosecution questioned Mr. Clayton about a prior consistent statement in which he had asserted that the defendant remarked on the victim before the house was visible. Upon further cross-examination, Mr. Clayton testified that he changed the location of the defendant's discovery because as he had more time to think, he remembered more clearly. Mr. Clayton testified that he and the defendant were stopping by the house to get the defendant's fishing equipment and that the defendant had no blood or injuries on him.

The defendant's step-mother, Joyce Rochelle, testified that around a week before the assault, the defendant, who was staying with his mother, came in the back door of the house she lived in with the defendant's father and immediately said he wanted to kill that "son of a bitch." She did not know whom he meant, and the defendant's father told him to "leave him alone." She testified she was taking two different pain medications at the time of trial. William Rochelle, the defendant's father, corroborated that several days before the assault, the defendant was "ill at" the victim, who didn't want the Claytons to come to the house. Mr. Rochelle testified that the defendant stated he would "w[h]oop" the victim and that he told the defendant to "let it go" because he might end up in jail "if he tried to do something to him." He testified that the victim was staying at the house to keep his eye on things.

Dwight Prince, the victim's brother-in-law, testified that he found out about the assault the night it happened and went to the hospital, where he recovered $313 of the victim's money.

Leona Staggs, who lived near the defendant's mother's home, testified that she noticed someone lying on the porch at the house on her way home from work at about 4:00 p.m. Ms. Staggs could not tell if the person lying down was injured or just relaxing.

Donny Ferguson, an officer with the Lawrence County Sheriff's Department, investigated the victim's death at the time of the assault. He testified he was first alerted to the assault around 10:00 p.m., and after observing the victim, whose head, hands, legs, and groin were bruised, he discovered that the crime scene had been left unsecured. Officer Ferguson photographed the crime scene. He testified that because there was no blood on top of the aquarium glass, he believed the victim had been trying to get up and had knocked it over in the process. Officer Ferguson testified that the defendant was at the house and that they had begun to clean up inside. Officer Ferguson also identified photographs of the victim which depicted injuries to his legs, groin, hands, knees, and head. Officer Ferguson testified that he had asked the defendant where he was when he first saw the victim on the porch and the defendant pointed down the road. According to Officer Ferguson, however, the house was not visible from the location the defendant indicated. Officer Ferguson also testified that he interviewed Billy Self and investigated a bar where he was supposed to have bragged

about killing somebody. Officer Ferguson testified that he was not able to corroborate the story that Mr. Self had bragged about being involved in an assault.

On cross-examination, Officer Ferguson reiterated that the crime scene had been left unsecured. He testified that he took no blood samples from the scene or the victim's clothing for laboratory analysis; likewise no fingerprints were sent out for analysis. He confirmed that the victim's knuckles were bruised and that he noticed no blood or marks on the defendant. He stated that he did not search the house to see if he could discover any bloody clothing. He acknowledged that he did not write down the defendant's statement regarding the point at which he first saw the victim and that the defendant "basically told [police] which direction they were coming from." He testified that the injuries to the victim's groin were not made public and that he investigated Billy Self, who had been in prison for homicide, based on reports that Mr. Self had bragged about killing a person and "stomping their nuts." He testified that no similar crime occurred in the area at the time. Mr. Self had no alibi for the time of the assault. He testified that he interviewed Mr. Self, the bar's owner, and one other person at the bar, who reportedly overheard the comments. On redirect examination, Officer Ferguson testified that the person who had reported Mr. Self's comments was the defendant's step-father. Officer Ferguson found no corroboration for the story.

Dr. Adele Lewis, a forensic pathologist at the Davidson County Medical Examiner's Office, performed the autopsy. Dr. Lewis testified that the victim had been five feet, seven inches tall and weighed 136 pounds. The victim had multiple blunt force injuries, including a lot of bruising on the left side of his head, bruising and scrapes on his legs, bruising in his genitals, bruising of both forearms, and bruising of his back. His brain was swollen and soft and showed at least seven areas of bleeding. Dr. Lewis found the cause of death to be multiple blunt force injuries, and her report indicated that the manner of death was homicide.

The defendant's step-father, Tim Elliot, testified that he had taken the victim to the store approximately one month before the assault and the victim, seeing Billy Self, said, "I'm going to have some serious problems with that fellow." Mr. Elliot testified that in general, nobody ever had trouble with the victim. The victim then asked to borrow a shotgun. Mr. Elliot testified he never recovered the gun. Mr. Elliot also testified that a man named Kirk Pyle,[2] who was afraid to come to the police, had told him comments made by Mr. Self, and that he gave the police Mr. Pyle's contact information. On cross-examination, Mr. Elliot stated he had not told law enforcement about the shotgun because they did not ask and did not want to give him the chance to tell. Mr. Elliot then testified that he did tell law enforcement about the gun when he was trying to recover it. He testified that the victim, rather than the defendant, was housesitting because the defendant "was doing his own thing."

---

[2]Mr. Pyle's name is alternately spelled "Pile" in the transcript.

Eugene Luna, the defendant's great uncle, testified that the defendant worked with him at the time and that on the day of the assault he went home around 3:30 p.m. or a little after. Mr. Luna testified that they ate lunch between 11:00 a.m. and 12:00 p.m., and that he ate a sandwich onsite while the defendant left for approximately thirty minutes at lunchtime. On cross-examination, he testified that he did not remember whether the defendant went to lunch. He testified that the defendant acted normal the next day.

Donny Kilburn testified that between 12:00 p.m. and 1:00 p.m. on the day of the assault, the defendant and his sister came to his home for ten to twenty minutes to look at removing a hollow tree with bees in it. Mr. Kilburn testified that the defendant said he was going to go to Brad Rochelle's house.

Brad Rochelle, the defendant's cousin, testified that the defendant came to his farm on the day of the assault around 3:30 or 4:00 p.m. He testified that the defendant was helping to clear rocks and stumps and would normally take two loads, but only took one that day. He testified that the defendant normally stayed until dark but left around 6:00 or 6:30 p.m. On cross-examination, he testified he could have started work as late as 4:30 p.m.

Chuck Harris testified that sometime in 2006, the defendant asked him if he could fish in his pond. He did not remember specifically when the defendant asked.

The State called Billy Self in rebuttal. Mr. Self testified that about thirty years ago, he and the victim had had a disagreement regarding the mother of Mr. Self's child. He testified that, after his release from prison, he saw the victim in his yard two times and that he had no animosity towards him. He denied telling Kirk Pyle that he had stomped a man to death or kicked his testicles.

The jury acquitted the defendant of first degree murder but convicted him of the lesser included offense of voluntary manslaughter. The trial court sentenced the defendant to five years in prison. On appeal, the defendant asserts that the trial erred in failing to grant a mistrial when Agent Melton testified regarding the anger management issues. He also challenges the sufficiency of the evidence.

## Analysis

### A. Sufficiency of the Evidence

Under Tennessee Rule of Appellate Procedure 13(e), an appellate court must set aside a defendant's conviction "if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." The reviewing court determines "whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). The appellate court is not permitted to reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). When the jury returns a guilty verdict approved by the trial court, a presumption of guilt replaces the presumption of innocence, and the appellant bears the burden of proving that the evidence was insufficient to support the verdict. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Purely circumstantial evidence can be sufficient to establish the criminal offense, and the State is under no obligation to exclude every reasonable hypothesis save the guilt of the defendant. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

The defendant was convicted of voluntary manslaughter, which is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2010). It is distinguished from second degree murder by the presence of adequate provocation leading to a state of passion. *State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001). The question of whether the provocation was adequate falls to the province of the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

The defendant alleges that there is simply not enough evidence to connect him with the killing and attempts to shift the blame to Billy Self. The evidence, seen in the light most favorable to the State, established that the victim was staying at the same residence as the defendant, and the defendant found the victim to be "constantly aggravating" because he failed to help with housework, continually asked for rides, and because of other "small things." Ultimately, the defendant confessed to the crime and told law enforcement, "I'm responsible for his death and all over the fact that I wouldn't go get him any beer."

The defendant visited his father and step-mother several days before the crime and threatened to kill the victim and "w[h]oop" him. When the defendant and Jonathan Clayton approached the house, the defendant stated he could see the victim before it was physically possible for him to do so; he likewise indicated to law enforcement that he saw the victim from down the road. The defendant did not attempt to render physical aid to the victim, and when Mr. Clayton offered to ride in the ambulance with the victim, the defendant expressed his continued desire to go fishing. This evidence is sufficient to support the defendant's

conviction.

The defendant contends that he could not have committed the crime because he had accounted for his whereabouts. Although the defendant presented several alibi witnesses, the jury was not obliged to accept their testimony uncritically, particularly given that two of these witnesses were relatives of the defendant and that the times given by some witnesses were inconsistent with the times given by others. Furthermore, even if the jury accepted the witnesses' testimony, there were some unaccounted for periods of time – for instance, between 3:30 and 4:30 p.m. – during which the crime might have been committed. Although the proof of the defendant's guilt was not overwhelming, we conclude it was legally sufficient, and a rational trier of fact could have found him guilty of the crime.

### B. Mistrial Based on Evidence Regarding the Defendant's Anger.

The defendant contends that the trial court erred when it did not grant his motion for a mistrial based upon Agent Melton's testimony about the defendant's anger management issues. The State argues that the issue is waived because the defendant failed to contemporaneously object to the testimony and in fact elicited further references to the anger management issue.

Under Tennessee Rule of Appellate Procedure 36, the court is not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Furthermore, the Rules of Evidence require "a timely objection or motion to strike …, stating the specific ground of objection." Tenn. R. Evid. 103(a)(1). The Advisory Commission Comment reiterates that the objection must be timely and specific.

It appears from the record that defense counsel unwittingly solicited the testimony by attempting to ask Agent Melton regarding the "first part" of the interview, which defense counsel believed was encompassed in the timeline portion of Agent Melton's notes but which Agent Melton recalled included statements regarding the defendant's anger management. Defense counsel then asked about another phase of the interview, which Agent Melton designated as "Buttons" in his notes. Defense counsel again mentioned the "discussion of the buttons" in questioning Agent Melton, who further referenced the defendant's anger management issues in response. Defense counsel objected after he was finished with cross-examination and during the State's preparation to redirect.

The State contends that the defendant's objection was not timely. There is authority for the proposition that an objection must be contemporaneous to be timely. *See State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001); *State v. Killebrew*, 760 S.W.2d 228,

235 (Tenn. Crim. App. 1988). "An objection is contemporaneous if counsel makes the objection in a motion in limine or at the time the objectionable evidence is about to be introduced." *Halake*, 102 S.W.3d at 669. However, this court has treated a delayed objection as a motion to strike, which is "appropriate any time inadmissible evidence has been heard by the trier of fact." *State v. Dean*, 76 S.W.3d 352, 368 (Tenn. Crim. App. 2001) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 1.03[4][c] (4th ed. 2000)) (concluding that the issue was not waived simply because the motion was made the morning after the evidence had been introduced). A motion to strike can serve as a late objection and "may properly be made at any time prior to the formal closing of the evidentiary record and the final resting of the case by all parties." *State v. Pilkey*, 776 S.W.2d 943, 952, 953 (Tenn. 1989). A motion to strike may be made after the evidence is presented as long as the integrity of the trial would not be compromised by the delay. Neil P. Cohen et al., *Tennessee Law of Evidence* § 103[4][g] (4th ed. 2012). In the case at bar, the trial court, in response to counsel's "contemporaneous" motion in limine, had previously ruled that Agent Melton could not testify regarding the anger management issues. Agent Melton nevertheless mentioned the defendant's temper in response to defense counsel's questioning. Counsel's motion, although characterized as an objection, was in fact a motion to strike and was timely with regard to Agent Melton's first reference to the defendant's anger management issues. *See Pilkey*, 776 S.W.2d at 953.

Even when an objection or motion to strike is timely, "[a] defendant cannot be heard to complain about incompetent evidence he elicits by cross-examination." *Pulley v. State*, 506 S.W.2d 164, 168 (Tenn. Crim. App. 1973); *see also May v. State*, 474 S.W.2d 172, 176 (Tenn. Crim. App. 1971). Moreover, although the trial court found that Agent Melton's initial statement was not responsive to the question, which defense counsel intended to limit to the first two written pages of notes, defense counsel subsequently referenced the discussion of "buttons," and in doing so " failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). *See State v. Wilson*, No. 02C01-9404-CC-00078, 1995 WL 15549, at *11 (Tenn. Crim. App. Jan. 18, 1995) ("While the trial court could excise the initial statement made by [the witness] from the record, the trial court could not strike the subsequent testimony that was elicited by counsel after [the witness] made the nonresponsive answer."). Counsel's delay in making the motion to strike allowed further testimony of the defendant's temper to be put in the record. We conclude that the defendant is not entitled to relief under Tennessee Rule of Appellate Procedure 36(a). However, even if defense counsel's delayed objection and questions eliciting the testimony did not preclude relief, we conclude that the trial court's denial of the motion for a mistrial was, in any event, not in error.

A trial court's decision regarding a motion for a mistrial is reviewed for abuse of discretion. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). A mistrial is only appropriate

in cases of manifest necessity or when a trial cannot continue without a miscarriage of justice. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). A mistrial is an avenue "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict," and the defendant bears the burden of establishing manifest necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In reviewing a trial court's denial of a mistrial, the appellate court must consider: (1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof. *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). However, "no abstract formula should be mechanically applied and all circumstances should be taken into account." *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting *Jones v. State*, 403 S.W.2d 750, 753 (1966)).

The testimony regarding the defendant's temper was not elicited by the State. Although defense counsel's initial question was based on a section of Agent Melton's notes which did not refer to anger management, defense counsel's continued questioning elicited further testimony regarding the defendant's temper. The court gave curative instructions promptly after defense counsel's objection. While the State's proof in the instant case was not particularly strong, we conclude that the trial court did not abuse its discretion in finding that the jury could still reach an impartial verdict and that continuing the trial would not result in a miscarriage of justice.

## CONCLUSION

For the foregoing reasons, we conclude that the trial court did not err in denying the defendant's motion for a new trial, and we affirm the judgment of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE