FILED

08/13/2020

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 15, 2020 Session

## STATE OF TENNESSEE v. WILLIAM BRIAN ROBINSON

**Appeal from the Criminal Court for Davidson County**
**No. 2001-A-383     Mark J. Fishburn, Judge**

### No. M2019-00451-CCA-R3-CD

The Defendant, William Brian Robinson, was convicted by a jury of second degree murder, for which he received a sentence of seventeen years. See Tenn. Code Ann. § 39-13-210. On appeal, the Defendant argues that (1) the trial court erred by denying his request to present evidence that the State had previously pursued two theories of guilt that were inconsistent with its theory at trial; (2) there was insufficient evidence to support his conviction, specifically, challenging the mens rea element of knowing; (3) the trial court erred by allowing a witness to testify about blood spatter evidence when that witness had not been qualified as an expert; and (4) the cumulative effect of these errors requires a new trial.[1]  After a thorough review of the record and applicable authorities, we reverse the judgment of the trial court and remand the case for a new trial on the charge of second degree murder, during which the Defendant shall be permitted to present evidence of the State's previous theories of guilt.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Martesha L. Johnson, District Public Defender; Jeffrey A. DeVasher, Assistant District Public Defender (on appeal); and Jennifer Dusenberry, Brian M. Griffith, and Georgia Sims, Assistant District Public Defenders (at trial), for the appellant, William Brian Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King and

---

[1] For the sake of clarity, we have reordered the issues as presented by the Defendant in his appellate brief.

Tammy H. Meade, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

It was undisputed that the Defendant stabbed his girlfriend, Sheila Matlock Calloway ("the victim"), to death on November 9, 2000. The Defendant was first tried for first degree premeditated murder in October 2001. See Tenn. Code Ann. § 39-13-202. During the first trial, the State presented evidence that only the victim's blood was found on the murder weapon, a butcher knife, and that a smaller steak knife found in the kitchen had the Defendant's blood on it. See State v. William Brian Robinson, No. M2002-00665-CCA-R3-CD, 2003 WL 21653882, at *6 (Tenn. Crim. App. Jul. 11, 2003), perm. app. denied (Tenn. Nov. 24, 2003). The State then argued to the jury that the lack of blood on the butcher knife contradicted the Defendant's version that the victim stabbed him first with the butcher knife and submitted that the Defendant used the steak knife to cut himself in an effort to cover up his crime. Ultimately, a Davidson County Jury convicted the Defendant of first degree premeditated murder, thereby rejecting the Defendant's argument regarding his mental state at the time of the killing or any indication of self-defense. Following the jury's guilty verdict, the Defendant was sentenced to automatic life imprisonment.

The Defendant appealed to this court, "claiming that the evidence was insufficient as a matter of law to sustain the verdict, and in particular, that the evidence was insufficient to prove premeditation." Robinson, 2003 WL 21653882, at *1. This court affirmed the Defendant's conviction, determining that the State had established the element of premeditation beyond a reasonable doubt. See id. at *12. In so concluding, this court noted that "[a]lthough the Defendant claimed that the victim cut him with the same knife with which he stabbed her, only the victim's blood was found on that knife." Id. Our supreme court denied the Defendant's application for permission to appeal.[2]

In 2015, the Defendant filed a petition for writ of habeas corpus in federal court. The United States District Court granted the petition in part and ordered a new trial based on the State's failure to disclose exculpatory evidence—that only a portion of the murder weapon had been tested—and improper prosecutorial comment during closing argument about that evidence. William B. Robinson v. Jim Morrow, Warden, No. 3:08-CV-00235,

---

[2] The Defendant also filed an unsuccessful petition for post-conviction relief. See William B. Robinson v. State, No. M2005-01122-CCA-R3-PC, 2006 WL 3498140 (Tenn. Crim. App. Nov. 22, 2006), perm. app. denied (Tenn. Mar. 12, 2007).

2015 WL 5773422, at *20-29 (M.D. Tenn. Sept. 30, 2015).  When the butcher knife was retested, it was found to contain both the Defendant's and the victim's DNA on the tip.

The case was remanded.  In April 2018, the Defendant was again tried for first degree premeditated murder of the victim.  At the Defendant's second trial, the State adduced the following proof.

Lakisha Green confirmed that her mother, the victim, was romantically involved with the Defendant and that while her mother had her own separate residence from the Defendant's, she stayed with the Defendant and had moved some of her belongings into his residence.  According to Ms. Green, the victim was right-hand dominant.

On November 9, 2000, Metropolitan Nashville Police Department ("MNPD") Officer Dan Whitley was dispatched to the Defendant's one-bedroom apartment on Murfreesboro Road around 11:30 a.m.  According to Officer Whitely, 911 had received an out-of-state call from the Defendant's mother, who informed the dispatch operator that she had spoken with the Defendant and that he had admitted to killing his girlfriend.  Officer Whitley testified that he was the first officer to arrive on the scene, arriving approximately three minutes after his being dispatched.

Upon his arrival, Officer Whitley knocked on the door of the apartment, and he was quickly met by the Defendant, who appeared "shocked" and had "a really disturbed look on his face."  The Defendant, who was upset, held out his hands to Officer Whitley, palms up, and said, "cuff me."  The Defendant slowly turned around and placed his hands behind him in order to be handcuffed.  Officer Whitley observed "blood everywhere" on the Defendant's arms and on his t-shirt.[3]  Officer Whitley handcuffed the Defendant, who indicated to Officer Whitley that he had "messed up."  When Officer Whitely asked if anyone else was inside the apartment, the Defendant told Officer Whitely that his girlfriend, the victim, was dead inside the apartment; the Defendant further informed him that no one else was there.  Believing it was otherwise safe to enter, Officer Whitley placed the handcuffed Defendant on some stairs outside the apartment within Officer Whitley's peripheral vision.  According to Officer Whitley, the Defendant was cooperative and did not attempt to flee.

Officer Whitley testified that upon entering the apartment, he saw the victim lying on her back on the floor in the living room area of the open-floor plan apartment.  She was dressed only in her bra and underwear, and her head was propped up on a pillow or blanket.  There was a breathing machine next to her body, as well as a butcher knife.  According to Officer Whitley, there was an ironing board nearby, and it appeared as though someone

---

[3] Officer Whitley stated that the Defendant's t-shirt was white, but the photograph exhibit showed that the t-shirt was in fact black.

- 3 -

had been ironing. Officer Whitley could not detect a pulse and believed that the victim was dead.

Officer Whitley acknowledged that he was only inside the apartment for a brief amount of time. He also confirmed that he had previously testified about this case "at a hearing" in October 2001.

MNPD Officer Michael Sanders was next to arrive on the scene where he encountered Officer Whitley standing in the doorway of the apartment. Seated on the steps near Officer Whitley was the Defendant, who was in handcuffs. Officer Sanders remained outside with the Defendant until he later placed the Defendant in the backseat of his patrol car. Once inside the car, Officer Sanders began drafting the Defendant's arrest report. According to Officer Sanders, while in custody, the Defendant asked whether he would be charged with murder, as well as proclaiming to Officer Sanders that "[he] did it, [he] loved [the victim], [he was] wrong for what [he] did to her." According to Officer Sanders, the Defendant continued to talk, stating that he and the victim had gotten into a fight, that she had cut him, and that he had stabbed her. The Defendant further asserted that "he did not have to strike back like that, that a man [was] supposed to be stronger than that."

When MNPD Detective Mike Smith approached the patrol car to get the Defendant's identification, Officer Sanders informed Detective Smith that the Defendant had not yet been advised of his Miranda rights,[4] to which the Defendant blurted out, "I waive Miranda." According to Officer Sanders, the Defendant, who was "visibly upset" and "emotional," indicated that he wanted to cooperate, that the investigation "would not take much," and that he would "tell the detective anything he want[ed] to know."

Officer Sanders opined that he spent over one hour with the Defendant that day, also transporting the Defendant to the Criminal Investigation Division of the police department for a formal interview with Detective Smith. Officer Sanders's interactions with the Defendant were recorded; a portion of the recording was played for the jury.[5] Officer Sanders opined that he did not find most of the recording to be audible, and he did not recall referring to the Defendant as "boy." While being cross-examined about his previous statement that "there was nothing on" the recording, Officer Sanders explained that "[w]hen they played part of it for [him] prior to the previous trial," he had not had a chance to listen to the entire recording.

---

[4] See Miranda v. Arizona, 384 U.S. 436 (1966).

[5] However, the recording was never entered as an exhibit, and it is not a part of the record on appeal.

Several MNPD crime scene identification officers, whose duty it was to collect evidence, photograph the scene, and take measurements as necessary, began to arrive at the Defendant's apartment to process the scene. First to arrive was MNPD Officer Raymond T. Rader, Jr. When Officer Rader entered the apartment, he observed blood on the front door, the floor, and the walls of the apartment. Officer Rader testified that the victim's body was in the prone position lying in the living room near the bedroom door. He recalled that she was lying in a pool of blood and obviously deceased, that a breathing apparatus was connected nearby with the mask close to her face, that her head was propped up on a pillow, and that she was surrounded by some bloody towels. Officer Rader observed a large butcher knife next to the victim, as well as a smaller steak knife on a small counter in the kitchen. He also noticed that an iron on the ironing board in the living room, which was near the front door, was still turned on; there were also some red markings on the towel covering the ironing board.

Officer Rader took close to eighty photographs of the scene, and he was able to lift fingerprints from the steak knife. In addition, Officer Rader collected a piece of carpet from the living room stained with what appeared to be blood.

Another MNPD officer, William Merryman, sketched a diagram of the scene, and at trial, Officer Rader identified the diagram drawn by Officer Merryman. The diagram was entered as an exhibit.[6] Officer Rader identified on the diagram the location of the victim's body, the blood streak on the carpet sample, and the butcher knife. He confirmed that the butcher knife was taken into evidence and contained a "good amount of blood on it." He acknowledged that the steak knife was not originally identified in the diagram prepared by Officer Merryman despite its being collected from the scene and photographed.

Officer Merryman's 2001 trial testimony was read into the record because he had died before the trial.[7] Officer Merryman testified that he responded to the call and assisted Officer Rader in processing the scene. He confirmed that he drew a diagram of the apartment while all the evidence was in place. In addition, he collected twelve blood samples and one substance sample at the scene. Specifically, Officer Merryman collected blood samples from a kitchen cabinet door, the east wall in the dining room, the wall behind the microwave in the kitchen, the counter top behind the microwave, the counter top near the microwave, the north wall in the living room, the kitchen floor, the floor by the front

---

[6] The original diagram was admitted as exhibit; it showed an appellate court stamp from the previous direct appeal proceedings. The trial court informed the jury that this exhibit had been introduced at a previous hearing and that a party had appealed an evidentiary ruling requiring the need for the stamp.

[7] Prior to the State's reading the testimony into the record, the trial court informed the jury that the testimony of Officer Merryman was "from a previous hearing" and that Officer Merryman had since passed away.

door, and the inside of the front door.  He also collected a sample of a red substance from the bathroom sink.  He testified that some of the blood samples were wet but that most of them were dry; he agreed that dry blood samples tended to be older than wet ones but that there was no way to tell how long the dry samples had been in the apartment.

MNPD Officer Charles Anglin testified that he assisted with the collection of evidence from the Defendant's apartment, including both the steak knife and butcher knife.  He confirmed the location of both knives as depicted in the photographs.  Officer Anglin confirmed that the steak knife was propped up on a white lighter, which was not collected.

Brad Corcoran was a MNPD homicide detective in November 2000.  Prior to trial, it was noted that Detective Corcoran gave blood spatter testimony at the Defendant's first trial without being qualified as an expert to do so.  Due to the State's late notice that they would be seeking to qualify Detective Corcoran as an expert at this trial, the trial court ruled that Detective Corcoran would not be able to testify as a blood spatter expert or provide similar testimony for the State.

Detective Corcoran testified that he performed a walk-through of the apartment and made an evaluation of the crime scene in this case.  He observed no proof that any of the evidence had been tampered with or altered.  Detective Corcoran explained that because the victim in this case could not be resuscitated and was pronounced dead at the scene, her body remained in the apartment at the time of his examination.  Detective Corcoran confirmed that Officer Merryman's diagram accurately represented the location of the items depicted therein.  Detective Corcoran also described the contents of multiple photographs taken from the scene.

After Detective Corcoran identified photographs of blood drops in the foyer at the front door of the apartment, he was asked whether there was "anything of evidentiary value on the door[.]"  Detective Corcoran replied, "At the very top, it appears to be a transfer stain of blood."  The defense objected to the statement as being improper expert testimony, and the trial court sustained the objection to the blood found on the door's being categorized as a transfer stain.  Detective Corcoran then explained how the blood observed on the top of the door ran down the length of the door in "drip-trails."

Detective Corcoran was shown a photograph of the carpeted area "just after you enter off the foyer area," and he confirmed that drops of blood were present.  The Defendant lodged another objection when Detective Corcoran viewed a photograph of blood drops on a wall in the foyer and described them as "cast-off stains."  The trial court sustained this objection.  The State rephrased the question: "Do we appear to be looking at blood in this photograph?"  Detective Corcoran answered in the affirmative and explained that the photograph depicted the wall in the foyer leading into the living room.

- 6 -

He also identified a picture of drops of blood next to the sofa in the living room, as well as the "blood streak that was indicated in the diagram." Detective Corcoran was then asked "what did that streak appear to be?" The defense's objection that the question called for improper blood spatter expert testimony was overruled, and Detective Corcoran stated, "It's some type of object that had blood on it that has been placed on the carpet and transferred that—that pattern from the object onto the carpet." When the defense renewed its objection, the trial court again overruled the objection, reasoning, "It's just what it appears, to him, to be." Detective Corcoran also testified that what appeared to be blood was observed at the bottom of a kitchen cabinet and two or three different places on the kitchen floor.

Detective Corcoran stated that the greatest concentration of blood was found in the foyer near the front door. Except for the evidence surrounding the victim's stabbing, the apartment did not appear to be in disarray, and everything appeared to be "normal in place," according to Detective Corcoran.

Detective Corcoran acknowledged that he referred to the steak knife as a paring knife in his report, as well as referring to the butcher knife as a fillet knife, and that his report incorrectly referenced the location of the butcher knife as being found on the other side of the sofa from the victim's body. However, according to Detective Corcoran, the diagram correctly depicted the butcher knife's location. Detective Corcoran indicated that "some of the reports" reflected that the steak knife was found on a kitchen table, while others indicated that it was found on the dining room table, but he explained that "it was a combination," meaning those were the same table. He confirmed that he had previously testified in this case at a hearing in 2001, and he affirmed that his testimony was consistent with his earlier testimony.

In November 2000, Mike Smith was a detective in the MNPD homicide division and was assigned as the lead investigator in this case. After speaking with the Defendant, who was seated in the back of Officer Sanders's patrol car, Detective Smith left the scene to interview the Defendant at the police department. Once at the station, prior to interviewing the Defendant, Detective Smith advised the Defendant of his constitutional rights under Miranda, which the Defendant waived, and he agreed to speak with Detective Smith. The interview, which was recorded, was played for the jury.

The Defendant's version that he provided to Detective Smith was that he and the victim, to whom he was engaged to be married, got into an argument over money. He was ironing her shirt as they were preparing for the work day when the argument escalated. The Defendant explained that the victim grabbed the "big carving knife" from the kitchen and "scratched" on his arm. He became "enraged" and "snatched" the knife away from her and "hit" her twice with it. After he grabbed the knife, he first stabbed her in the back, then spun her around, and as "she [came] back around," he stabbed her again.

Upon further reflection, the Defendant recalled that the victim scratched him as they struggled. They were "scuffling a little bit." He also remembered that more than one knife was present. The Defendant described it as a "pruning knife" that was smaller with a smooth blade and a dark handle, and he had been using it to scrape the buildup off the bottom of the iron. He denied using the smaller knife to stab the victim.

The Defendant admitted that he did not immediately seek medical attention for the victim. After he stabbed her, he kept telling her that he was "sorry" and that he "didn't mean to hit [her] that hard." He tried to carry her to the bedroom, but they did not make it that far. He got several towels and tried to cover her wound; he propped her head up with a pillow; and he placed a blanket next to her. When he saw that she was struggling to breathe, he grabbed his sleep apnea machine in an effort to assist her.

After he tried to render aid, he began crying because he knew she was dying. He wanted to kill himself with the knife but did not. However, instead of dialing 911, he first called his mother who lived in Louisville, Kentucky. He then called his friend Brenda McKinney who lived in Memphis. He admitted to both women that he had stabbed the victim to death. The Defendant knew that his mother had dialed 911.

During the interview, the Defendant made a number of incriminating statements, including that the victim had barely "scraped" him and that "she wouldn't hurt [him] in a million years." The Defendant conceded that "it wasn't her fault" and stated that "she didn't do anything to justify what [he] did." He admitted that he "snapped" and lost control. Finally, he stated that after he stabbed the victim in the back, he "could have stopped there."

At trial, the photographs of the Defendant in the interview room, including the wounds on his arms, were admitted into evidence and shown to the jury. Detective Smith testified that the Defendant stood five feet six inches and weighed 198 pounds. Detective Smith said that he observed two scratches or cuts on the Defendant's right arm and a puncture-type wound on the Defendant's left arm. Detective Smith testified that the wounds were not actively bleeding when he observed them and that the Defendant did not seek medical assistance, nor did he appear to be in need of medical assistance for his injuries.

Detective Smith stated that he submitted the butcher knife for analysis to the Tennessee Bureau of Investigation ("TBI") on April 25, 2001. He did not give the lab technician instructions on where to test because he believed that "the whole knife" would be analyzed. Detective Smith became aware in January 2011 that there was additional DNA testing of the knife performed at the Defendant's request. However, Detective Smith did not know the results of the additional testing.

Margaret Bash testified that in 2000, she was a special agent forensic scientist in the TBI Crime Laboratory; Agent Bash was introduced as an expert in DNA analysis. Agent Bash testified that the victim's blood was found on the breathing machine, the carpet sample, and a blanket, as well as in the blood samples taken from the front door, the kitchen cabinet door, the east dining room wall, the counter near the microwave, the living room, and the kitchen floor. Agent Bash also tested the shirt and pants that the Defendant was wearing at the time of his arrest. She found blood matching that of the victim's on the Defendant's shirt. She also found human blood on his pants; it contained a mixture of genetic material from more than one person, of which the victim was the primary contributor.

In addition, Agent Bash testified that she tested the steak knife found in the Defendant's apartment. She "found a blood stain of human origin, and the DNA profile matched" the Defendant's; she was able to say this conclusively despite her being unable to match a locus variant in the Defendant's profile. Agent Bash affirmed that the Defendant's blood was on the tip of the steak knife. In addition, Agent Bash observed a lighter reddish-brown stain on the reverse side of the steak knife, but she did not test that stain.

Relative to her examination of the butcher knife found next to the victim's body, Agent Bash found human blood which matched the victim's DNA profile. Agent Bash tested the dark blood-like stain on the blade near the handle, which she recalled as being the darkest stain on the butcher knife. She acknowledged that blood was present elsewhere on the knife but that she did not test those other areas. Agent Bash indicated that had she been aware that someone else had possibly been cut with the butcher knife besides the victim, she "might have worked more than one area" on the knife. Agent Bash concluded her involvement with the scientific testing in the case after she issued her report on July 25, 2001.

Thomas Fedor testified that he was a forensic serologist and DNA analyst at Serological Research Institute ("SERI") in 2011, and Mr. Fedor testified as an expert in the field. Mr. Fedor confirmed that at the request of the Defendant, SERI conducted additional DNA testing on certain items of evidence in this case in January 2011. According to Mr. Fedor, SERI received the butcher knife, the steak knife, the Defendant's pants, and the DNA profile of the victim and the Defendant; Mr. Brian Wraxall analyzed the evidence and prepared a report of his findings. Mr. Fedor relayed that Mr. Wraxall, the chief of SERI and Mr. Fedor's boss, had died four years before the Defendant's trial. Mr. Fedor identified Mr. Wraxall's report, which was published to the jury. Mr. Fedor confirmed that he was the technical reviewer on the case, and Mr. Fedor indicated that he agreed with Mr. Wraxall's findings in his report.

Mr. Fedor detailed the information in Mr. Wraxall's report for the jury. Both the Defendant's and the victim's DNA were found in the bloodstains on the Defendant's pants.

Relative to the butcher knife, five areas of blood staining were found on the butcher knife, including stains on the tip and the handle. The victim was "almost certainly" the major contributor of the blood stain found on the tip of the blade on "side A"; the Defendant was a "possible . . . minor contributor to that mixture." A stain from the handle on side A evidenced a mixture of genetic material from more than one person—the victim was "almost certainly the major contributor," the Defendant was "a potential contributor," and "there [was] a trace amount of DNA in that sample that did not come from either" the Defendant or the victim. On the other side of the butcher knife, or side B, the Defendant was "almost certainly" the major contributor of the blood stain found on the tip of the butcher knife with the victim's "possibly" being the minor contributor. On one stain from the handle of side B, the victim was "almost certainly" the source of the blood. A mixture of genetic material from at least two people was found on a second stain on the handle of side B with the victim's being "a potential major contributor," but the mixture was too weak to draw any conclusions about a minor contributor. Mr. Fedor confirmed that he could offer no opinion on whose DNA or blood was first present on the butcher knife.

Relative to the steak knife, two samples were taken from different sides of the handle of the steak knife. Both samples tested presumptively positive for blood but were insufficient for comparison. The tip of the steak knife was not tested by SERI.

Mr. Fedor testified that Mr. Wraxall was an experienced analyst. Mr. Fedor also stated that other than a negligible difference of opinion in word choice, he did not disagree with Agent Bash's original findings. Mr. Fedor indicated that having background information of the circumstances surrounding the offense was helpful to facilitate adequate testing of the evidence.

Dr. John E. Gerber was the assistant medical examiner in Davidson County in 2000, and he performed the victim's autopsy on November 10, 2000, the day following the stabbing. Because Dr. Gerber died prior to trial, his testimony from the first trial was read into the record and his autopsy report was admitted as evidence.

Dr. Gerber reported that the body of the victim was five feet, three inches in height and weighed 155 pounds. He diagnosed the cause of the victim's death as "multiple stab wounds of the torso or the chest, abdominal area," and he determined the manner of death to be homicide. Dr. Gerber testified that the body had two stab wounds, one in the front left upper chest, and the other in the left upper back. He could not tell which wound had been inflicted first.

Dr. Gerber testified that the front wound evidenced a five to six-inch penetration depth, was one and nine-sixteenth inches in length, and was one-sixteenth of an inch wide. The stab resulted in a fractured left second rib, a lacerated upper lobe of the left lung, a lacerated pericardium, and a superficial penetration of the left side of the heart. According to Dr. Gerber, a significant amount of force was necessary to penetrate a rib, as was done to the victim through the frontal wound. In addition, Dr. Gerber reported that the back wound had a depth of three to four inches but that it was superficial, meaning that it ran parallel to the surface of the body. This wound measured one and one-half inches in length and one-sixteenth of an inch wide. Dr. Gerber examined the butcher knife found in the Defendant's apartment, and he concluded that the victim's stab wounds were consistent with being inflicted by the blade of that knife.

Dr. Gerber opined that the stab wound to the chest was the fatal wound. He explained that the victim suffered a significant amount of blood loss from the torn lung, and he agreed that she bled to death. He estimated that with those wounds, the victim could have lived for as long as twenty or thirty minutes. Dr. Gerber stated that although he could not testify to a reasonable medical certainty as to how long the victim lived, the fact that she had a collapsed lung and damage to her heart put her at great risk for a "fairly sudden" death. He further opined the injuries such as the victim's were fatal without urgent and immediate medical attention.

That concluded the State's proof. After the denial of the Defendant's motion for judgment of acquittal, he presented the following proof.

Lorita Marsh, the forensic supervisor of the latent-print section of the MNPD, testified that she was a fingerprint analyst and received a request to analyze two latent fingerprint cards that were obtained from the crime scene—one was a print lifted from the four-and-half-inch blade of the steak knife found in the Defendant's apartment, and the other was from the kitchen countertop near a microwave where the steak knife was found. She also received major case prints from the Defendant for comparison.

Ms. Marsh testified that the print from the kitchen countertop was not of sufficient quality to make a comparison. Relative to the print on the steak knife, the print was of sufficient quality, but she was unable to make a complete comparison due to inadequate "major case prints" from the Defendant. Despite a request, she never received new prints from the Defendant in order to conduct a follow-up comparison.

Max L. Jarrell, a certified latent print examiner since 1978, testified as an expert in fingerprint analysis and comparison. Like Ms. Marsh, he requested better major case prints from the Defendant to make a conclusive comparison to the print found on the blade of the steak knife. After obtaining additional prints from the Defendant, he generated a report of

his findings on July 7, 2011. Mr. Jarrell determined that the print found on the steak knife did not match any of the major case prints retrieved from the Defendant.

Dr. Feng Li, the Chief Medical Examiner for Davidson County at the time of trial, was tendered as an expert in forensic pathology. Dr. Li reviewed the victim's autopsy case file at the request of both the State and the defense. Dr. Li agreed in general with Dr. Gerber's assessment of the victim's injuries and cause of death, including that "a significant amount of force would have been needed" to inflict the victim's chest injury. He added that the stab wound to the victim's chest was a horizontal wound, going from front to back and slightly downward, and in contrast, the wound to the victim's back went vertically from top to bottom, as well as left to right parallel with her body. Dr. Li opined that the victim's back wound was consistent with having been inflicted while she was moving up and down. He also said that it would be consistent for a person who had sustained a chest injury similar to the victim's to remain alive for five to seven minutes. However, Dr. Li classified the stab wound to the back as also life-threatening.

The Defendant testified in his own defense; he denied that he intentionally killed the victim or ever contemplated killing her, indicating instead that the killing was accidental. The Defendant relayed a similar version as that he had provided Detective Smith during the taped interview. He maintained that he and the victim were arguing that morning about money and that at some point, the argument became physical. The Defendant conveyed that he was standing in front of the ironing board ironing the victim's clothes, which was between the front door and the living room, when she came at him with a knife.

According to the Defendant, the victim approached him from his rear left side, holding the knife in her right hand. She arrived at the ironing board and quickly swung the knife from upwards to downwards, right to left. He testified that he did not notice that the victim had a knife until she was approximately "a foot in front" of him. He said that the victim "struck [him] once to the arm and once across to [his] left arm and once across [his] arms because [he] crossed them to block it." The Defendant explained that he crossed his arms, grabbed her wrist, and took her right wrist behind her right shoulder so that the knife was pointing downward at her back, presumably inflicting the back wound. He then grabbed and pulled the knife out of her hand, spun her around, and pushed her while holding the knife. He testified that the victim was stabbed in the chest when he pushed her. He estimated that it was two or three seconds from the time the victim hit him on his arm to when he pushed her away and stabbed her in the chest. He acknowledged that he pushed the victim "real hard" and that he was angry that she had come at him with a knife. He indicated that he thought he was only "pushing her away, pushing her down."

The Defendant said that after he removed the knife from the victim's chest, he tried to move her to the bedroom but that she collapsed on the floor in the living room area. He

placed a pillow and blanket that were on the sofa underneath the victim. He also got some towels from the bathroom and tried to stop the bleeding. The victim began making a "gargling sound" as if she were having trouble breathing, and she soon after stopped breathing. The Defendant attempted to use his sleep apnea machine to revive the victim. The Defendant estimated that the victim died approximately five to seven minutes after he stabbed her.

The Defendant admitted that he did not dial 911, but he instead called his mother and then his friend Ms. McKinney. His mother told him that she would call the authorities. According to the Defendant, the police arrived approximately twenty to thirty minutes after the victim had died. He claimed he did not intentionally let the victim die.

The Defendant averred that he did not move or clean anything in the house in an attempt to cover up his crime. In addition, he denied cutting himself with the steak knife or using the knife to inflict his wounds.

On cross-examination, the Defendant agreed that he was five-feet, six inches tall, was "quite fit" at the time, lifted weights at the gym, and was "much stronger" than the victim. Furthermore, the Defendant indicated that the victim was a decade older than he and that the victim suffered from some health problems, specifically that she suffered from seizures.

The Defendant testified that as part of his training for correctional facilities and security jobs, he was trained in self-defense and pressure point control tactics. He acknowledged that he also had training in domestic violence issues. In addition, while serving six years in the United States Army, he had been trained in hand-to-hand combat, weaponry, and first aid.

The Defendant affirmed that the victim had never previously threatened to harm him nor had she ever attacked him. The Defendant acknowledged that he told Detective Smith that he was enraged and angry but not fearful of the victim. He denied ever telling Officer Whitley that he had "messed up." He confirmed that he never mentioned to the police that the stabbing was accidental or claimed that he was acting in self-defense. He maintained that he was honest in his dealings with the police.

Following the conclusion of the proof, the Defendant was convicted of the lesser-included offense of second degree murder. See Tenn. Code Ann. § 39-13-210. Thereafter, the trial court imposed a Range I, standard offender sentence of seventeen years. After denial of the Defendant's timely motion for new trial, this appeal followed.

ANALYSIS

The Defendant presents the following issues on appeal: (1) whether the trial court erred by denying the Defendant's request to present evidence that the State had previously pursued two theories of guilt that were inconsistent with its theory at trial; (2) whether there was insufficient evidence to support his conviction, specifically, challenging the mens rea element of knowing; (3) whether the trial court erred by allowing Detective Corcoran to testify about blood spatter evidence when he had not been qualified as an expert; and (4) whether the cumulative effect of these errors requires a new trial. We will address each in turn.

### I. Evidence of Inconsistent Theories

A. Habeas Corpus Proceedings. Prior to our analysis of the Defendant's issue, a review of the federal habeas corpus proceedings is in order to place the issue in its full context. In the habeas corpus proceedings, the Defendant claimed that the prosecution withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), specifically in connection with the DNA testing conducted on the butcher knife used to kill the victim. Robinson, 2015 WL 5773422, at *20. The Defendant complained that "the prosecution withheld evidence establishing that 'the TBI's test of the butcher knife was, for all practical purposes, meaningless,' by failing to reveal that it had only tested a single spot on the knife, far from the cutting edge and near the handle." Id. The Defendant continued that "if that fact had been disclosed, the prosecution would not have been able to cite the test results as proof that [the Defendant's] blood was not on the knife and that, ergo, [the Defendant's] statement to police and trial testimony that the victim had cut him with the knife were false." Id. Moreover, the Defendant asserted that

> the true facts about the DNA testing performed by the [S]tate would have led defense counsel to conduct additional testing, which would have proven that [the Defendant's] blood was in fact on the cutting edge of the knife and would have corroborated his testimony about having been attacked by the victim.

Id.

In analyzing the merits of the Defendant's issue, the district court summarized the relevant proof presented during the habeas corpus proceedings as follows:

> When the prosecution sent the butcher knife, which was known to be the weapon with which the victim was stabbed, to the TBI for DNA analysis, it did not provide any special guidance regarding the need to confirm or rule out the presence of [the Defendant's] blood on the knife. The prosecutor was aware that under normal circumstances, the TBI wants to minimize DNA

testing and might stop testing once it has identified the victim's blood on a piece of evidence[] and that she would need to instruct them to do more testing if the goal was to find out whether the [D]efendant's blood was present. Specifically, she was aware that the TBI might stop after testing a single spot on a piece of evidence if "they find what they're looking for," which would be determined by the referral paperwork.

In this case, the detective's TBI Request for Examination of the butcher knife did not provide any particular instructions, and the prosecutor's letter generically requested "DNA analysis." No one ever informed TBI Agent Margaret Bash that the purpose of the testing was to determine whether [the Defendant's] blood was on the butcher knife. Had she been informed that that was the purpose of the testing, or even that more than one person at the scene of the killing was bleeding, she would have tested multiple areas on the knife. In the absence of that instruction, Agent Bash assumed that the purpose of the testing was to determine whether the butcher knife was used to stab the victim. She therefore collected DNA from only one spot on the knife—away from the cutting edge, near the handle—and determined that it matched the victim. The Agent recorded her findings in two documents: an official typewritten report indicating in relevant part that the blood on the knife matched the victim, and a handwritten analysis that reflected in pertinent part that the single "area worked" on the butcher knife was opposite the cutting edge and closer to the handle than the tip of the knife. The prosecution disclosed to the defense only the official typewritten report.

The defense was not provided with the handwritten report showing the limited nature of testing done on the butcher knife, despite a discovery request from defense counsel expressly asking for any reports of scientific tests or experiments material to the preparation of a defense; all material known to the prosecution team that was exculpatory or may lead to exculpatory material, including the reports of any investigations carried out by the TBI; any such evidence or information that would tend to lessen the degree of [the Defendant's] guilt or mitigate his punishment; any such evidence that is favorable in that it is exculpatory, would tend to reduce the degree of offense or punishment, or might be used to impeach the credibility of any government witness; any memoranda or reports "which might fairly be said to contradict or be inconsistent with any evidence which the State intends to adduce in this matter"; and "[a]ny documentary evidence in the possession of the State which contradicts or is inconsistent with any testimony the State intends to introduce in this cause." The [S]tate's

discovery response stated that there was no exculpatory material to provide[] and that "counsel may assume that any specific request which is not answered is either not discoverable or the information requested is not available."

The prosecutor then proceeded to try the case on the theory that [the Defendant's] claim that the victim cut him with the butcher knife was false, and that he had actually cut himself with a smaller knife after stabbing the victim. In her opening statement, she laid out the theory of the falsity of [the Defendant's] defense as follows:

> It's also very important, when you listen to the statement that he gave the police, to listen to what he says about the knife that was used. He says the only knife that's ever used in this altercation is this big butcher knife.

> And you'll see it. It was there, it was left right next to her body, was collected by the police; it's tested by the TBI Lab. He says that's the knife that [the victim] pulled on him and struck him with.

> Well, you'll hear from the serologist, Agent Bash, his blood's not on that big, old butcher knife, [the victim's] blood's on that butcher knife. His blood, come to find out, is on this little bitty old steak knife, that's in the kitchen.

> When you hear the officers testify about the crime scene, take into consideration where these knives are located. Compare the evidence at the crime scene with what [the Defendant] says in his statement to the police.

During trial, the prosecutor had the typewritten TBI report entered into evidence as Exhibit 24, and elicited the following testimony from TBI Agent Bash about the DNA testing conducted on the butcher knife:

> Q. Okay. And did you test that item for the presence of human blood?
> A. Yes, I did.
> Q. Okay. And what were the results of your testing on that item?
> A. I found human blood, and the DNA profile matched [the victim].

And finally, much of her final closing argument was devoted to highlighting evidence supporting the theory that [the Defendant] had inflicted his own wounds with a small steak knife[] and that his claim that the victim had attacked him with the butcher knife did not "make sense."

Robinson, 2015 WL 5773422, at *20-22 (footnote omitted).

After detailing these facts, the district court observed that "[t]he prosecutor's theory was effective and was clearly significant to the state court proceedings following [the Defendant's] conviction." Robinson, 2015 WL 5773422, at *22. The district court first noted that, "[i]n denying [the Defendant's] motion for new trial, the trial court relied in part on the fact that his testimony was 'vastly' 'inconsistent with what was found at the scene' with respect to blood evidence and which knife was involved." Id. The district court then noted that this court, in denying the Defendant relief on direct appeal, found sufficient evidence of premeditation based in part on its belief that "[a]lthough the Defendant claimed that the victim cut him with the same knife with which he stabbed her, only the victim's blood that [sic] was found on the knife." Id. (citing Robinson, 2003 WL 21653882, at *12).

The district court then indicated that during discovery permitted in the course of the habeas corpus action, the Defendant "for the first time was able to review the TBI documentation underlying the official report used at trial, and discovered that the only spot tested was near the handle far from the cutting edge." Robinson, 2015 WL 5773422, at *22. The district court observed that the additional DNA testing it authorized "confirmed that [the Defendant's] blood is on the tip of the butcher knife on both sides, mixed with the victim's blood, and that it was in fact the 'major contributor' of DNA on one side of the knife tip." Id.

After determining that the evidence had been suppressed for Brady purposes, the district court further found "that the evidence of the limited nature of the testing on the butcher knife was clearly favorable to the defense." Robinson, 2015 WL 5773422, at *24. The district court reasoned that the suppressed evidence would have both impeached the testimony of a key prosecution witness, as well as undermined the prosecution's theory of the case. The district court noted the following in support of that conclusion:

On cross-examination, the limitations of the DNA testing on the butcher knife would have minimized the impact of Agent Bash's official report and testimony about the knife and called into question the thoroughness of her analysis and value of her result, given that it was undisputed that the victim had been stabbed with the butcher knife. It also would have undercut the

prosecution's theory that [the Defendant] had to be lying about being attacked by the victim.

Id.

The district court observed that the State's "primary argument against finding this evidence favorable to [the Defendant] is that the presence of [the Defendant's] blood on the tip of the butcher knife actually proves that he used the knife to cut himself after he stabbed the victim." Robinson, 2015 WL 5773422, at *24. Specifically, the State asserted that "had he been stabbed by the tip of the murder knife prior to his using it to stab his fiancée, it is unlikely his blood would still be on it, particularly as the major contributor on one side of the tip." Id. The district court surmised, "This novel speculation is unsupported by any scientific evidence and contrary to the prosecution's argument at trial. Moreover, the possibility that a piece of evidence might have a hypothetical weakness, or that the prosecution might have a response to it, does not change the favorable nature of the evidence." Id. (footnote omitted).

Addressing the final Brady element, the district court concluded that the suppressed evidence was material and its suppression was prejudicial to the Defendant. Robinson, 2015 WL 5773422, at *25. In so concluding, the district court reasoned,

"[E]vidence that directly undermines the prosecution's theory of the charged crime is 'plainly material' under Brady." Comstock v. Humphries, 786 F.3d 701, 713 (9th Cir. 2015). As discussed above, the erroneous construction of the TBI report as proof that [the Defendant's] blood was not on the butcher knife—which would have been disproved by the suppressed evidence—was one of the lynchpins of the prosecutor's premeditation theory at trial and was an important factor in the state court decisions that followed. This court, in ruling on the extent of discovery to be permitted, has already observed that "[t]he testing of the blood on the knife's cutting edge used in the stabbing appears to be significant and material proof on a first degree murder charge." Disclosure of the true facts of the butcher knife testing would have rebutted or entirely prevented the prosecution's theory that [the Defendant's] statements and testimony about killing the victim in a sudden rage after she attacked him were false. Moreover, that disclosure would likely have prompted the more thorough testing finally conducted during the course of this case, which establishes that [the Defendant's] blood is on the tip of the knife and corroborates his version of events. Although the prosecutor might still have pointed to the [Defendant's] blood on the steak knife and his failure to call 911 as the victim was dying in support of her case for premeditation, suppressed evidence need not undercut "every item of the

- 18 -

State's case" in order to be material.  Bies[ v. Sheldon], 775 F.3d [386,] 399 [(6th Cir. 2014)] (quoting Kyles[ v. Whitley], 514 U.S. [419,] 451 [(1995)]).

While it is undisputed that [the Defendant] killed the victim, the evidence of premeditation needed to support his conviction for first degree premeditated murder was far from overwhelming.  [The State] argues that evidence of his blood on the knife is not material because it would have been redundant to the evidence admitted at trial about the cuts on his arms.  [The State] would have the court disregard the likelihood that the jury convicted [the Defendant] of first degree premeditated murder because it accepted the prosecutor's theory—based largely on an inaccurate and misleading representation of the blood evidence—that [the Defendant's] version of events was fabricated and that the victim had not attacked him with the butcher knife.  Given the obvious significance, as indicated above, of the butcher-knife-blood evidence to the prosecution, the trial court and the state court of appeals, the court finds that it was reasonably likely to have had a similar impact on the jury.  There is thus at least a reasonable probability that disclosure of the fact that the presence of [the Defendant's] blood on the butcher knife had not been ruled out—particularly if it had prompted the further testing that establishes that his blood was on the knife—would have altered the outcome of [the Defendant's] trial.

Id.

B. Pretrial Proceedings Following Remand.  On March 20, 2018, the Defendant filed a "Motion for Pretrial Ruling Regarding Admissibility of Evidence," requesting that the trial court permit "him to introduce prior inconsistent theories of guilt presented by the prosecution during the prosecution of [the Defendant] for first degree murder." Specifically, the Defendant cited to the original trial prosecutor's opening statement in the 2001 trial and argued for admission of the trial transcript.  The Defendant noted the State's theory from the first trial was that the Defendant lied about the circumstances surrounding the murder, including his allegation that the victim first cut him with the butcher knife, and that he inflicted his own wounds with the smaller steak knife in an attempt to conceal his crime.  In addition, the Defendant sought admission of the original trial prosecutor's deposition testimony during the federal habeas corpus proceedings.  The Defendant cited to the State's theory of guilt during the federal habeas corpus proceedings after it was revealed that the Defendant's DNA was in fact present on the tip of the butcher knife, that being "that the presence of [the Defendant's] blood on the tip of the butcher knife actually proves that he used the knife to cut himself after he stabbed the victim." Robinson, 2015 WL 5773422, at *24.  According to the Defendant, during the deposition, the original prosecutor was asked about this new evidence, and she answered as follows:

- 19 -

Q: So—so your—your theory at trial was that he used the steak knife to cut himself and that he didn't use the butcher knife to cut himself?

A: Yes.

Q: Right.

A: Yes.

Q: Now your theory is that he used the butcher knife to cut himself?

A: Obviously. Since his blood is on the tip of the knife, it just makes sense to me that there's no way his blood would be on the tip of that knife if he had stabbed her twice, the second one going that deep, I don't know how in the world his blood could be there unless he had used that butcher knife after he stabbed her to inflict those wounds he had on his arms.

Q: So you think his blood would be totally removed by her blood getting on it.

A: I do, yeah.

Q: Do you have any basis for that opinion.

A: Just common sense.

The Defendant then referenced an August 1, 2011 analytical report issued by the SERI, "stating that it was not aware of any scientific studies to support the validity of [the original prosecutor's] new theory that if [the Defendant] were cut first that his blood would be removed by the action of stabbing [the victim]."

In support of his argument for introduction of the trial transcript and the original prosecutor's deposition testimony, the Defendant, quoting State v. Daniel Nesbit, submitted "that allowing the prosecution to continue to change theories of guilt, without allowing defense counsel to 'bring the conflict to the fact finder's attention' violate[d the Defendant's] due process rights." See No. W2016-00492-CCA-R3-CD, 2017 WL 6210860, at *6 (Tenn. Crim. App. Dec. 8, 2017)). Citing State v. Gregory Robinson, the Defendant also contended "that allowing the [S]tate to proceed at multiple trials with different theories of guilt should trigger due process considerations." See No. W2001-01299-CCA-R3-DD, 2003 WL 21946735, at *15-16 (Tenn. Crim. App. Aug. 13, 2003), rev'd, 146 S.W.3d 469 (Tenn. 2004)). Relative to a potential hearsay objection, the Defendant submitted that such evidence was admissible as a business record exception pursuant to Tennessee Rule of Evidence 803(6), as the trial transcript and deposition were both records of regularly conducted activity and were self-authenticating under Tennessee Rule of Evidence 902(11) when accompanied by the appropriate affidavit from the custodian of records.

A pretrial hearing was held on the motion. Defense counsel argued that the evidence was relevant because it went "to the credibility of the police's investigation" and "to the credibility of the prosecutor's office" who had tried "for seventeen years, . . . to shape these

facts to fit it back into the box of first degree murder." Defense counsel further commented on the potential credibility issues, "[W]hen they stand in front of the [j]ury and we're sure, this time, we've got it right. Believe us. We know what happened. Well, this is your third bite at the apple with the same facts to try to fit it into first degree murder."

The State responded that the issue was "very, very novel." The State indicated that the cases cited by the Defendant were distinguishable on their facts, those cases either dealing with co-defendants in separate trials (Robinson) or separate trials of the same defendant for two different acts (Nesbit). The State asserted that there was a lack of authority in support of admission of this type of evidence. Regarding relevance, the State indicated that the original prosecutor's theory at the 2010 deposition was "totally irrelevant" and that admission of the prosecutor's arguments at the 2001 trial was untenable and would confuse the issues.

The trial court noted that both sides had "additional information or evidence" to present in this trial; that "new evidence" would "in and of itself likely" impact "the theory of the case"; that it would not "put the prosecutors back on trial for actions that were done back in 2001"; that generally the jury should not be informed about a prior trial; that prosecutors often change strategy "in mid-stream" and "certainly" after all the evidence had been presented; and that a different prosecutor was now trying the case. The trial court indicated, "I'm having a hard time understanding how their prior theory becomes relevant under any circumstances." Defense counsel responded to these comments, noting that this case involved a retrial due to the State's misconduct and not merely because an evidentiary ruling was reversed. Defense counsel averred that it was fundamentally unfair to deny the Defendant the opportunity to present proof of the State's "single narrow-minded tunnel vision" of the Defendant's guilt regardless of how the evidence had changed over time. Stating the relevance another way, defense counsel said, "[O]ur argument might be that no facts would have made a difference, that they were always determined to prosecute [the Defendant] for . . . first degree murder, and they're going to shift their theory no matter what to try to prosecute him for that—that offense." The trial court took the issue under advisement.

At a subsequent hearing, the trial court ruled from the bench, and that ruling was memorialized in a written order filed the next day. In the order, the trial court concluded that "[t]here was no compelling due process reason either side should be allowed to tell the jury about prior theories that may have been presented in this case." The trial court further determined that "[t]here [was] no authority that would permit" introduction of this kind of evidence. The trial court also observed in its oral ruling that "[t]heories are not evidence."

C. Appeal. On appeal, the Defendant insists that the trial court erred in denying his motion to admit evidence that the State previously pursued two theories of guilt that were inconsistent with its theory of guilt at his second trial. Specifically, he submits

that preventing him from showing that different theories had been advanced in the first trial and in the habeas proceedings—one of which stemmed from the prosecution's suppression of evidence, and both of which were later proven to be factually and scientifically inaccurate—violated his right to due process of law and a fair trial.

In addition to citing similar precedent as he did in his motion, the Defendant also cites to a case from the United States Court of Appeals for the Second Circuit, United States v. GAF Corp., 928 F.2d 1253 (2d Cir. 1991), in support of his argument. The Defendant requests a new trial. The State responds that that Defendant is not entitled to a new trial because his right to a fair trial was not violated by the trial court's decision, and it attempts to distinguish GAF Corp. on its facts.

Generally, the admission of evidence at trial is entrusted to the broad discretion of the trial court, and as such, a trial court's ruling on the admission of evidence may only be disturbed upon a showing of an abuse of discretion. State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). For evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded by the trial court if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

In addition, Tennessee Rule of Evidence 802 states that hearsay statements are not admissible "except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. A party-opponent admission is not excluded by the rule against hearsay. Tenn. R. Evid. 803(1.2). A party-opponent admission is "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity[.]" Id.

Though the Defendant cited to the business records exception in his motion, we observe that attorneys' statements in related cases have been admitted as party-opponent admissions in a number of cases in the federal courts. See United States v. Branham, 97 F.3d 835, 851 (6th Cir. 1996); United States v. DeLoach, 34 F.3d 1001, 1005 (11th Cir. 1994); United States v. McKeon, 738 F.2d 26, 33 (2d Cir. 1984); United States v. Orena, 32 F.3d 704, 716; United States v. Salerno, 937 F.2d 797, 811-12 (2d Cir. 1991); United States v. GAF Corp., 928 F.2d 1253, 1262 (2d Cir. 1991); United States v. Ganadonegro, 854 F.Supp.2d 1088, 1092 (D.N.M. 2012); United States v. Bakshinian, 65 F. Supp. 2d 1104, 1105-06 (C.D. Cal. 1999). State courts also have recognized the applicability of the

party-opponent admissions doctrine in criminal cases under similar facts. See State v. Cardenas-Hernandez, 579 N.W.2d 678, 685-86 (Wis. 1998); People v. Cruz, 643 N.E.2d 636, 664-65 (Ill. 1994); Hoover v. State, 552 So. 2d 834, 840 (Miss. 1989).

For example, in GAF Corp., the case cited by the Defendant, the Second Circuit held that the Government's prior bill of particulars in the case, which was inconsistent with the Government's amended bill of particulars in a later trial of the same case, could be admitted into evidence. 928 F.2d at 1262. The court observed that "if the government chooses to change its strategy at successive trials, and contradict its previous theories of the case and version of the historical facts, the jury is entitled to be aware of what the government has previously claimed, and accord whatever weight it deems appropriate to such information." Id. The court articulated the reasons for allowing a defendant to introduce this type of evidence:

> [T]he jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts.

928 F.2d at 1260.

Similar to the case under consideration, in Ganadonegro, the United States' initial first degree murder prosecution ended in a mistrial. 854 F.Supp.2d at 1092. It then superseded the initial indictment, charging second-degree murder, voluntary manslaughter, and negligent child abuse. Id. at 1093. The defendant sought to admit statements from the United States' closing argument at the first trial that he shook a child "knowingly, intentionally and willfully" to "illustrate that the United States has admitted that it was wrong in terms of the theory on which it proceeded at the first trial and that it could be wrong again." Id. at 1126-27. The court agreed that the "statement has a tendency to make the fact that he did not have a culpable mental state more probable than it would be without the evidence, or at least permits an inference to that effect." Id. It thus allowed the defendant to introduce the statement into evidence in the second trial. Id.

In accordance with this jurisprudence, we likewise conclude that admissions made in one legal proceeding by a party's lawyer, through pleadings or in-court statements, can be admitted as evidence in a subsequent proceeding. Nonetheless, though the evidence falls within the scope of party admissions doctrine, the court must still consider whether it is relevant under Rule 401 and whether it should be excluded pursuant to Rule 403. In this context, it has been observed that "the admission of a statement by the government in a

- 23 -

prior case would raise substantial dangers of confusing the jury and wasting time." Bakshinian, 65 F.Supp.2d at 1110.

Assessing the relevance of this evidence, we observe that the theory of defense in this case was that the killing was accidental, occurring during an argument and after the victim first came at the Defendant with the butcher knife; that the Defendant had been forthcoming and cooperative with the authorities; and that the inadequacy of the police investigation led to the steadfast prosecution of the Defendant for first degree murder. During closing argument, defense counsel made statements such as: (1) "Mike Smith and his team were only concerned with finding proof that [the Defendant] committed first degree murder."; (2) "[W]hen the State was asking Mike Smith questions, his memory was okay, but when it was [defense counsel's] asking him questions that got to the heart of the sloppy investigation, that's when his memory started getting bad."; (3) "I submit it's because they're hoping you'll forget how sloppy this investigation was."; and (4) "[D]ue to Mike Smith's sloppy way of doing things, no one knew for a decade that [the Defendant's] DNA was on the butcher knife that he told police on November the 9th he was cut with because Margaret Bash didn't know and tested a completely irrelevant spot." According to defense counsel, the subsequent DNA testing of the butcher knife corroborated the Defendant's version of events. Defense counsel surmised for the jury that the Defendant was guilty of reckless homicide.

The State responded in its rebuttal argument by asserting that finding the Defendant's DNA on the butcher knife was not "the ah-ha proof for the defense" it claimed, parsing the nuances of Mr. Fedor's testimony about blood and DNA in blood stains. The State noted that the Defendant's behavior following the stabbing was "very strange," and observed, "What in the world is going on in this house after he stabs her?" The State posited that the Defendant might have "doctored the evidence." The State theorized,

> Could the Defendant have gotten a butcher knife during an argument, stabbed his fiancée in the back, spun her around, stabbed her in the front, watched her bleed out, not call the police, not call for help, then stage a scene, cut himself and then lie to the police and manipulate the system over eighteen years because that narrative, obviously not one spun by [the Defendant], but could be accepted by you in light of everything you know in this case?"

The State's change in theories of prosecution from the Defendant's first trial to his second trial was not the result of innocent explanation, but it was instead due to a Brady violation. As noted by the federal district court, the prosecution did not provide any special guidance to the TBI regarding the need to confirm or rule out the presence of the Defendant's blood on the butcher knife; the prosecution was aware that the TBI might stop testing once it had identified the victim's blood on the butcher knife absent additional instructions; and despite a discovery request from the defense, the prosecution did not

disclose Agent Bash's handwritten analysis reflecting that she only "worked" a single area of the butcher knife that was opposite the cutting edge and closer to the handle than the tip of the knife. The federal district court observed that had the State provided Agent Bash's handwritten document to the defense, it likely would have prompted additional testing, which would have led to the discovery of the Defendant's blood on the knife. The federal district court surmised that the evidence of the limited nature of the testing on the butcher knife was clearly favorable to the defense because it would have both impeached the testimony of a key prosecution witness, as well as undermined the prosecution's theory of the case. The State's change in theory was not simply because of the discovery of new evidence as the trial court indicated in its finding from the bench.

What is more, the jury had already been presented with much of the same evidence from the first trial, as well as most of the evidence related to the subsequent testing in 2011. The jury was also aware that prior proceedings had taken place in the case given the multiple references to such proceedings and the reading of prior testimony from witnesses who had since died; thus, allowing this evidence would have led to little confusion or waste of time.

The evidence which the Defendant sought to admit would have illustrated that the State was wrong in terms of the theories on which it proceeded at the first trial and during the habeas corpus proceedings, and that it could be wrong again about the Defendant's guilt. We are constrained to agree with the Defendant that this evidence had a tendency to make the fact that he did not have the requisite culpable mental state more probable than it would be without the evidence, or at least permitted an inference to that effect. Accordingly, we conclude that the probative value of admission of this evidence was not substantially outweighed by the danger of unfair prejudice and that the trial court abused its discretion by failing to allow it.

Furthermore, despite the trial court's best efforts, the jury had also been told from Officer Sanders that the Defendant had been previously tried. This led to two curative instructions from the trial court. First, the trial court instructed,

> Members of the Jury, the [c]ourt has made every effort to prevent you from knowing the history of this case. The [c]ourt was and remains concerned that the knowledge of this case's history would improperly influence your objectivity as the judges of the facts and the law in the trial of this case in favor of one party or the other. Unfortunately, my efforts were undermined when a reference was made to a prior trial during yesterday's proceedings. Subsequent to that trial, new evidence was discovered that may be relevant to the issue of guilt or innocence and which served as a basis for the retrial of this case. However, what weight, if any, you give this evidence is solely for your determination to make. You are not to speculate on what

- 25 -

the verdict was in the prior trial. It is irrelevant to you fulfilling your oath as Jurors in this case. You are also not to speculate why the newly discovered evidence failed to be presented at the prior trial. Again, the reasons are irrelevant to you fulfilling your oath as Jurors in this case.

And, in its final instructions to the jury, the trial court stated,

> As you have been apprised, new evidence was discovered at the original trial that may be relevant to the issue of guilt or innocence and which served as a basis for the retrial of this case. However, what weight if any you give to this evidence is solely for your determination to make. You are not to speculate on what the verdict was in the prior trial. It is irrelevant to you fulfilling your oath as Jurors in this case. You are also not to speculate on why the newly discovered evidence failed to be presented at the prior trial. Again, the reasons are irrelevant to you fulfilling your oath as Jurors in this case.

These instructions in effect dismantled the defense which the Defendant sought to present—that being, the State's unwavering belief that the Defendant committed first degree murder regardless of how the forensic evidence had changed over time. We cannot say that the guilty verdict rendered in this trial was surely unattributable to the error touching on the Defendant's due process right to present a defense. Accordingly, the Defendant's case is remanded for a new trial.

## II. Sufficiency

In the event of further appellate review, we will address the Defendant's remaining issues so that they not be pretermitted. The Defendant contends that the evidence adduced at trial was insufficient to support his conviction for second degree murder. Specifically, the Defendant challenges the knowing mens rea element required for conviction, maintaining that the State failed to prove beyond a reasonable doubt that "he was aware that his conduct—pushing the victim away while holding the knife he had just wrested from her—was reasonably certain to cause her death." According to the Defendant, the proof established, instead, that the Defendant "consciously disregarded the risk that his conduct would cause [the victim's] death," thus, being consistent with a conviction for reckless homicide rather than second degree murder. The State responds that the proof, in the light most favorable to the State, supports a knowing killing and that therefore, the Defendant's conviction should be affirmed.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a "result of conduct" offense, meaning that the statute focuses "on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000); see also State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010). Here, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Whether a defendant acts knowingly is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105; see also Brown, 311 S.W.3d at 431.

The Defendant contends that the evidence is sufficient for reckless homicide, not second degree murder. Our criminal code defines reckless homicide as the "reckless killing of another." Tenn. Code Ann. § 39-13-215(a). It further provides,

"[r]eckless" refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).  Like second degree murder, reckless homicide is a "result of conduct offense." State v. Parker, 350 S.W.3d 883, 910 n.16 (Tenn. 2011) (citing Ducker, 27 S.W.3d at 896).  Evidence sufficient to support a second degree murder conviction is also sufficient to support a conviction for reckless homicide because proof that a person acted knowingly "simultaneously establishes, as a matter of law, that the person acted recklessly." State v. Davis, 466 S.W.3d 49, 70 (Tenn. 2015).

Here, we agree with the State that evidence, it the light most favorable to it, established a knowing killing.  The Defendant was younger, taller, and stronger than the victim, who suffered from seizures.  Moreover, the Defendant had been trained in self-defense, pressure point control tactics, and hand-to-hand combat.

The Defendant stabbed the victim twice—once in her back, and once in her chest. The chest wound was five to six inches deep; and it resulted in a fractured rib, a lacerated lung, a lacerated pericardium, and penetrated the heart.  The back wound was three to four inches deep.  The medical examiners agreed that the chest wound required significant force to inflict.  Though the Defendant was trained in first aid, he failed to seek immediate medical assistance for the victim, who bled profusely, and she lived for possibly twenty to thirty minutes after she was stabbed.

In addition, the Defendant made multiple statements to the officers indicating his consciousness of guilt—such as he did not have to strike her, he was wrong for what he did, and the victim did not do anything to justify what he did to her.  He told Officer Whitley that he had "messed up" and to handcuff him, and he told Officer Sanders that the investigation "would not take much."  The Defendant admitted to Detective Smith that he was angry at the victim for coming at him with the butcher knife and that he could have deescalated the situation once he disarmed her.

As stated above, whether the Defendant acted "knowingly" when he stabbed the victim was a question of fact for the jury, and a Defendant's mental state may be inferred from the surrounding facts and circumstances.  Here, we find the evidence sufficient to support the jury's verdict of second degree murder, i.e., that the Defendant's conduct was reasonably certain to cause the victim's death—based upon the use of the "big carving knife" to stab the victim twice, once in the chest, and also in the back; the depth of those wounds, as well as the significant force needed to inflict the frontal wound; and the Defendant's behavior and statements  after he stabbed the victim, noting summoning help and indicating that he could have deescalated the situation. See, e.g., State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998) ("[i]ntent . . . may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case . . . [including] the use of a deadly weapon, the number of wounds inflicted, the seriousness of the wounds").

In addition, the jury had the liberty to consider testimony about the Defendant's injuries and his assertion that the stabbing was accidental. The jury, as was their prerogative, was free to reject the Defendant's claim of accident or any inference of self-defense and accredited the evidence, in whole or in a part, offered by the State. Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction for second degree murder.

*III. Blood Spatter Testimony*

The Defendant argues that the trial court erred when it allowed Detective Corcoran, though he had not been qualified as an expert, "to give an opinion on the subject of blood spatter." According to the Defendant, Detective Corcoran's testimony that "the crime scene included a blood streak that had been transferred from an object onto the carpet" amounted to "an expert opinion by a witness who was not qualified as an expert, in violation of Tennessee Rule of Evidence 702." The State responds that "[b]ecause Detective Corcoran did not engage in complicated blood spatter analysis to give his opinion on the appearance of a blood drops at the crime scene, the trial court did not abuse its discretion in overruling the [D]efendant's objection." The State continues that any error in this regard was harmless "where Detective Corcoran's testimony had no substantial and injurious impact on the jury's decision to convict the [D]efendant."

Unless qualified as experts, witnesses may only offer opinions or inferences which are both "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." This court has held that "lay opinion testimony under Rule 701 is limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge which would qualify the witness as an expert under Rule 702." State v. Timothy Murrell, No. W2001-02279-CCA-R3-CD, 2003 WL 21644591, at *6 (Tenn. Crim. App. July 2, 2003) (citing United States v. Conn, 297 F.3d 548, 553 (7th Cir. 2002)).

The Tennessee Supreme Court has recognized "blood stain analysis" and the analysis of blood spatters as a field of expertise. See State v. Melson, 638 S.W.2d 342 (Tenn. 1982). Furthermore, this court has observed that, generally, testimony regarding blood spatter evidence requires an expert due to its complex nature and the opinion being predicated upon specialized knowledge unfamiliar to most lay persons. See State v. Halake, 102 S.W.3d. 661, 670-71 (Tenn. Crim. App. 2001). In so concluding, this court observed, "Blood spatter analysis is a complicated subject, as the analyst studies the blood spatter and determines what blow created the spatter, thereby recreating the events of the

crime." Id. at 672 (citing Melson, 638 S.W.2d 342). The panel further elaborated that "[o]ther states have also recognized the complexity of blood spatter analysis and the necessity of having a well-qualified expert testify regarding his or her analysis of the blood spatters." Id. (citations omitted).

On appeal, the Defendant cites to Halake in support of his argument that Detective Corcoran's testimony was erroneous and prejudicial, thus requiring a new trial. See 102 S.W.3d 661. In Halake, the police discovered two small round spots of the victim's blood on the defendant's pants legs. Id. at 669. Defense counsel objected when the prosecution asked a police detective to testify about the similarity between the blood spots on the defendant's pants and other blood spatter that the officer had observed from other gunshot wounds in other cases. Id. The officer, who had observed 100 crimes scenes and various forms of blood spatter, was not trained as an expert in identifying blood spatter. Id. After defense counsel's objection, the State attempted to lay a foundation to establish the officer's qualifications to answer the question. Id. at 670. The trial court then held a jury-out hearing and ruled that while the officer was not qualified to testify as an expert based on his training, he could qualify as an expert based upon his observations of numerous blood spatters at other crime scenes. Id. The trial court also noted that his qualification as an expert was for the limited purpose of answering the prosecution's one question. Id. Following this ruling, the officer testified as permitted: The spots of the victim's blood found on the defendant's pants were consistent with other gunshot blood spatter based upon the officer's experience. Id. at 669. On appeal, a panel of this court held that the trial court erred by qualifying the officer as an expert, there not appearing to have been a sufficient basis to do so. Id. at 672. The court went on to hold that the defendant was prejudiced by the officer's testimony concerning the blood spatters. Id.

The State responds that Halake is not applicable. The State first notes that Detective Corcoran was not testifying as an expert witness when he said that "the blood droplets appeared to have been 'transferred' onto the carpet by 'some object.'" The State then surmises that Detective Corcoran's testimony as a lay witness was admissible because he "was not engaging in blood spatter analysis to answer the question nor was he recreating the events of the crime."

We are constrained to agree with the State. Prior to trial, the trial court determined that Detective Corcoran could not testify as an expert witness due to the State's late notice that they would be seeking to qualify him as such. The trial court sustained several objections by the Defendant in this regard at trial when Detective Corcoran referenced transfer stains and cast-off stains. With regard to the specific question at issue, Detctive Corcoran was asked "what did that streak" next to the sofa "appear to be?" Detective Corcoran replied, "It's some type of object that had blood on it that has been placed on the carpet and transferred that—that pattern from the object onto the carpet." The trial court

concluded that the question did not solicit improper blood spatter expert testimony but was merely seeking Detective Corcoran's personal observations based upon his experience. We cannot say that the trial court abused its discretion in this regard. See, e.g., State v. James Williams, No. 88-175-III, 1988 WL 138843, at *2 (Tenn. Crim. App. Dec. 30, 1988) (finding no error concerning the opinion testimony from a lay witness because the officer's conclusion was based on simple observation of the bullets, without further testing, and could have been made by anyone familiar with weapons); see also State v. Edward Joseph Benesch II, No. M2015-02124-CCA-R3-CD, 2017 WL 3670196, at *24 (Tenn. Crim. App. Aug. 25, 2017). Moreover, any error in this regard would be harmless given that there was little dispute that the Defendant stabbed the victim, that it was the victim's blood on the carpet, and that Detective Corcoran's testimony about the blood streak was short and minimal. In sum, the Defendant is not entitled to any relief from this issue.

## *IV. Cumulative Error*

The Defendant contends that even if no single error requires a new trial, the cumulative effect of these errors—permitting Detective Corcoran to offer blood spatter testimony when he was not qualified as an expert to do so, as well as prohibiting the defense from presenting evidence that the State had presented inconsistent theories of the Defendant's guilt—mandates such action. The State responds that there can be no cumulative error because there was not more than one actual error committed in these proceedings.

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). Because we have only found one error in this case, the cumulative error doctrine is inapplicable. Nonetheless, we have determined that the single error entitles to the Defendant to reversal of his conviction for second degree murder and remand for a new trial.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed. The case is remanded for a new trial.

_____
D. KELLY THOMAS, JR., JUDGE